**John MILLS, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

**No. 96–SC–966–MR.**

Supreme Court of Kentucky.

April 22, 1999.

Rehearing Denied Aug. 26, 1999.

Richard Hoffman, Oleh R. Tustaniwsky, Assistant Public Advocates, Frankfort, KY, for appellant.

A.B. Chandler, III, Attorney General of Kentucky, Kent T. Young, Paul D. Gilbert, Assistant Attorneys General, Criminal Appellate Division, Frankfort, KY, Thomas V. Handy, Special Assistant Attorney General, London, KY, for appellee.

JOHNSTONE, Justice.

On August 30, 1995, Arthur L. Phipps was stabbed to death. Appellant, John Mills, was convicted of Phipps's murder, first-degree burglary, and first-degree robbery and was sentenced to death. He appeals to this Court as a matter of right, raising some thirty-two issues on appeal. We affirm both the conviction and the sentence.

Phipps's son-in-law, Terry Sutherland, discovered Phipps's body. On the day of the murder, Sutherland twice went to Phipps's house. On the first occasion, he left Phipps alive and in good spirits. Upon arriving the second time, he discovered a trail of blood leading up the front steps. He followed the trail of blood through the house. Sutherland found puddles of blood in the living room, and more blood in Phipps's bedroom and bathroom. He followed the blood trail to the kitchen where he found a pair of pants lying on the floor. Unable to locate Phipps inside the house, Sutherland went back outside where he found Phipps's body. While securing the crime scene, State Trooper Clyde Wells discovered a trail of blood leading away from Phipps's body. Wells and another police officer followed the blood trail to the front of a house rented from Phipps by Mills. Wells saw blood on the exterior walls of the house, on the front door, and a trail of blood crossing the front porch which led to a window. As Wells walked past a window at the back of the house, Mills opened the window and stared at Wells. Wells identified himself as a police officer and ordered Mills to remain where he was. Wells then went to the rear door of the house, which was open, and went inside.

The house was unlit and dark. Wells navigated through the house with the aid of a flashlight until he was able to locate a light switch. Wells flipped the switch and found Mills standing inside a doorway. Mills put up his hands and surrendered to Wells, whereupon Wells placed Mills in custody by putting him in handcuffs and advising him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Gary Partin followed Wells into the house. Partin placed Mills under arrest for Phipps's murder and also advised him of his *Miranda* rights. Mills told Partin he did not want to speak with him. Partin and Wells escorted Mills outside the house. At some point, the handcuffs were removed from Mills because he was bleeding profusely from the left wrist.

Also, at some point, Partin directed Sergeant Charles Elliot to bring a video camera to the crime scene.

Detective Ancil Hall arrived at Phipps's residence approximately ten minutes after Partin. Shortly thereafter, he was advised that a suspect was in custody at a nearby residence. When Hall arrived at Mills' house, Mills was lying on the ground covered with blood. Either prior to or after Hall's arrival, medical personnel arrived on the scene and began treating Mills' injuries. Partin informed Hall that he (Partin) already had advised Mills of his *Miranda* rights. Nonetheless, Hall again informed Mills of those rights. Mills told Hall that he would talk to him, and Hall proceeded to question Mills. At some point during the interrogation, Elliot arrived with the video camera and taped Mills' confession. The videotape of Mills' confession was played in its entirety before the jury.

## I. ARREST AND SEARCH

■ Mills argues that no exigent circumstance existed which allowed the police to make a warrantless entry into his home to effectuate his arrest. This allegation of error is unpreserved. However, because the death penalty was imposed in this case, we review this error under the standard set forth in *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1990), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991):

Assuming that the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Id.* at 668. However, we are not bound to assume error. *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 154 (1995), cert. denied, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

The police followed a blood trail to Mills' residence. There was fresh blood on the walls of the house, on an open window, and on the door and the porch. Detective Partin testified that based upon this physical evidence, he suspected that the perpetrator was inside the house and was wounded as well. Upon these facts, defense counsel could have made no legitimate argument that the police lacked exigent circumstances to enter Mills' residence at the time in order to render immediate aid and assistance. *See Mincey v. Arizona*, 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978); *Todd v. Commonwealth*, Ky., 716 S.W.2d 242, 247–48 (1986). The mere fact that the suspected perpetrator was also the person aided and assisted does not remove exigency of the circumstance.

■ Mills' argument that the search of the house was illegal and the fruits of that search should have been suppressed is also unpreserved. To the extent that this argument is based upon the argument that his arrest was illegal, that part of the argument is disposed of immediately above. The additional basis urged for finding the search to be illegal is on the grounds that there was no warrant for the search which occurred after Mills had been arrested and escorted outside of the house for medical treatment. Clearly, the exigent circumstances had vanished at that point. However, "[c]onsent is one of the exceptions to the requirement for a warrant." *Cook v. Commonwealth*, Ky., 826 S.W.2d 329, 331 (1992). To be constitutionally valid, the Commonwealth must prove by a preponderance of the evidence that consent was voluntarily given. *Id.* "The question of voluntariness turns on a careful scrutiny of all the surrounding circumstances in a specific case." *Id.*

On the videotape, the following exchange between Detective Hall and Mills occurs:

Hall: Can we go in [your house] and look around?

Mills: I got the key right in my pocket.

\* \* \* \* \* \*

Hall: You don't care if we go in and look around?

Mills: Buddy open the door. I don't care.

\* \* \* \* \* \*

Hall: You understand you don't have to let us look, now?

Mills: I don't give a f_ _k.

Upon these facts, defense counsel could have made no legitimate argument that Mills did not voluntarily consent to the search of his house.

## II. VOLUNTARINESS OF THE CONFESSION

■ On February 27, 1996, Mills filed a motion entitled: *Motion for the Court to in-camera review the video-taped interview of the defendant to determine the admissibility of said video-taped statement.* In the motion, Mills argued that the trial court should suppress his confession on grounds that his intoxication and injuries rendered the confession involuntary and unreliable. Upon review of the videotape, the trial court found that Mills' intoxication did not rise to the level of mania required by *Britt v. Commonwealth*, Ky., 512 S.W.2d 496 (1974). The trial court further found Mills' injuries were not sufficiently serious to render the confession involuntary. Finally, the trial court found that Mills' confession was not the product of duress or coercion.

■ Mills argues that the trial court's *in camera* review of the videotape did not satisfy the requirements of RCr 9.78, which are mandatory. The rule requires the trial court to hold an evidentiary hearing whenever a defendant moves to suppress a confession made to police authorities. In this case, the trial court did not hold an evidentiary hearing. The Commonwealth argues that because an *in cam-*

*era* review was all that Mills asked for, that was all he was entitled to. Reluctantly, we disagree.

RCr 9.78 places affirmative duties upon the trial court. The rule does not require that the defendant move for an evidentiary hearing. Instead, the rule mandates that a trial court shall hold an evidentiary hearing outside of the presence of the jury whenever a defendant moves to suppress a confession or other incriminating statements made to the police.

In the case at bar, the trial court erred when it failed to hold an evidentiary hearing to determine the admissibility of the confession. However, the error was harmless.

■ Most of Mills' confession was videotaped. There are no material or substantial facts in dispute surrounding the events occurring during the making of Mills' confession. In *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the United States Supreme Court stated that, absent a substantial factual dispute in the evidence, voluntariness of a confession may be properly decided by a reviewing court. *Id.* at 391–92, 84 S.Ct. at 1789. The voluntariness of a confession is assessed based on the totality of circumstances surrounding the making of the confession. *Allee v. Commonwealth*, Ky., 454 S.W.2d 336, 341 (1970), *cert. granted*, 400 U.S. 990, 91 S.Ct. 454, 27 L.Ed.2d 438 (1971), *case dismissed*, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971).

While the facts occurring at the time Mills confessed are not in dispute, Mills argues that there are other subjective factors that must be considered in assessing the totality of the circumstances surrounding the making of his confession. Specifically, he argues that his relatively low IQ (76) and his limited educational background render his confession involuntary.

■ Under the Due Process Clause of the Fourteenth Amendment, the question of the voluntariness of a confession turns on the presence or absence of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93

L.Ed.2d 473 (1986). Likewise, state action is required before a confession may be found not voluntary under Section 11 of the Kentucky Constitution. *Commonwealth v. Cooper*, Ky., 899 S.W.2d 75, 76 (1995). Thus, while low intelligence and limited education are elements to be considered in the totality of the circumstances analysis, *Allee*, 454 S.W.2d at 341, these factors are only relevant inasmuch as their presence causes a defendant to be predisposed to yield to coercive police tactics.

Therefore, upon careful review of the videotape, and taking into account the additional circumstances of Mills' low IQ and limited intelligence, we conclude that Mills' confession was voluntary. The record contains no evidence of police "coercion of a confession [obtained] by physical violence or deliberate means calculated to break [Mills'] will." *Oregon v. Elstad*, 470 U.S. 298, 312, 105 S.Ct. 1285, 1295, 84 L.Ed.2d 222 (1985). What the tape reveals is Mills answering willingly questions posed to him by Detective Hall. Additionally, Mills does not appear to be so intoxicated or injured so as to render his confession unreliable. *See Britt*, 512 S.W.2d at 500 (the issue is not whether a drunk's confession is a product of free volition, but rather whether the confessor was in sufficient possession of his faculties to give a reliable statement).

### III. WAIVER OF MIRANDA RIGHTS

■ The question of whether a defendant has voluntarily waived his *Miranda* rights is analyzed somewhat differently than the question of whether the underlying confession is voluntary. As stated in *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987), which was decided a year after *Connelly, supra:*

A statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. *Miranda v. Arizona, supra,* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d 694.... The inquiry whether a waiver is

coerced "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986):

> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Ibid. (quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

■ Additionally, the Commonwealth only needs to prove waiver of *Miranda* rights by a preponderance of the evidence. *Connelly,* 479 U.S. at 168, 107 S.Ct. at 522, 93 L.Ed.2d 473. Addressing the second prong of the inquiry first, clearly Mills knowingly and intelligently waived his *Miranda* rights.

■ On August 2, 1996, Mills made a motion *in limine* to suppress his confession on the grounds that he was not given his *Miranda* rights or, in the alternative, that the rights given were inadequate. The trial court held an evidentiary hearing and determined that Mills was given adequate warnings and had voluntarily waived his rights. The record reveals that at least two different officers testified that they read Mills his rights and that Mills understood the rights read to him. Further, Detective Partin stated that, after he read Mills his rights, Mills refused to talk with him and, thereby, invoked his right to remain silent. Mills did not testify at the hearing.

There was no testimony or evidence given at the hearing to contradict the police officers' testimony that Mills was advised of his rights, that he understood the rights read to him, and that he knowingly waived

them. *See Reeves v. Commonwealth,* Ky., 462 S.W.2d 926, 930 (1971), *cert. denied,* 404 U.S. 836, 92 S.Ct. 124, 30 L.Ed.2d 69 (1971) (uncontradicted testimony by witnesses for the Commonwealth satisfied a burden of proof higher than preponderance of the evidence to show waiver). Moreover, Mills was no stranger to the criminal justice system and did in fact exercise his right to remain silent.

Turning now to the first inquiry set forth in *Spring, supra,* we likewise conclude that Mills voluntarily waived his Fifth Amendment privilege. This inquiry, like the inquiry into the voluntariness of his confession, turns on state action. *Spring,* 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d 954. Mills did not testify at the evidentiary hearing. Nor did he introduce any other evidence of coercion at the hearing. Thus, the finding that Mills' confession was not coerced should be conclusive on the issue of whether the waiver of *Miranda* rights was coerced. However, on appeal he makes an argument in favor of coercion which was not raised at the evidentiary hearing. Specifically, he argues that waiver was coerced when he was questioned a second time by Detective Hall. We examine this possible error under the standard set forth in *Sanders, supra* .

In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, the United States Supreme Court held that the police may question a suspect, who had previously invoked his right to remain silent, provided the police "scrupulously honor" the suspect's right to cut off questioning. *Id.* at 104, 96 S.Ct. at 326, 46 L.Ed.2d 313. The Court then set forth the particular circumstances present in that case, which led the Court to conclude that the police had "scrupulously honored" Mosley's right to cut off questioning. These factors were: (1) Mosley was carefully advised of his rights prior to his initial interrogation, he orally acknowledged those rights, and signed a printed notification-of-rights form; (2) the detective conducting the interrogation immediately ceased question-

ing Mosley after he invoked his right to remain silent and did not resume questioning or try to persuade Mosley to reconsider his decision; (3) Mosley was questioned about a different crime more than two hours later at a different location by a different officer; and (4) Mosley was given a fresh set of *Miranda* warnings prior to the second interrogation. *Id.* at 104–05, 96 S.Ct. at 326–27.

The *Mosley* Court did not state that these factors were exclusive or exhaustive. Nor did it elevate any single factor above the others. Thus, we approach the Mosley analysis on a case-by-case basis. *Accord Christopher v. Florida,* 824 F.2d 836 (11th Cir.1987); *United States v. Hsu,* 852 F.2d 407, 411 (9th Cir.1988) (all relevant factors are to be considered). In examining all the relevant factors, we conclude that the police scrupulously honored Mills' right to cut off questioning.

When Detective Partin first advised Mills of his rights, Mills stated that he would not talk to. Partin. As there is no argument to the contrary, we assume that at that point in time Mills properly invoked his right to remain silent. Thereupon, Partin did not question Mills further. Nor did he pressure him to change his mind. Detective Hall re-advised Mills of his rights prior to questioning him. Further, where Mills refused to talk to Partin, he was willing to .talk to Hall. This is significant because the right to cut off questioning centers on the defendant's ability to "control the time at which questioning occurs, the subjects discussed, and the duration of the questioning." *Mosley,* 423 U.S. at 103–04, 96 S.Ct. at 326.

While there is no direct testimony as to the amount of time which lapsed between Mills' refusal to talk to Detective Partin and the questioning conducted by Detective Hall, the record indicates that it was a fairly short time, probably not more than ten or twenty minutes. Mills argues that this short lapse in time and the fact that he was questioned regarding the same crime are in conflict with *Mosley.* The lapse of time is clearly relevant to the

*Mosley* inquiry. *See id.* at 102, 96 S.Ct. at 326 ("To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned."). However, "the constitutionality of a subsequent police interview depends not on its subject matter, but rather on whether the police in conducting the interview sought to undermine the suspect's resolve to remain silent." *United States v. Schwensow,* 151 F.3d 650, 659 (7th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 626, 142 L.Ed.2d 565 (1998), citing cases from other circuits holding the same.

While the relatively short lapse of time between Mills' original invocation of his right to remain silent and his subsequent questioning gives us some concern, in this case, it does not weigh heavily enough in the totality of the circumstances to render Mills' waiver of his *Miranda* rights involuntary. We note that the second questioning was done by a different officer who was familiar to Mills and who also advised Mills of his *Miranda* rights. Thus, the cessation of questioning by Partin and the subsequent questioning by Hall were compatible with Mills' right to control the questioning by allowing Mills to determine with whom he would and would not talk.

Therefore, we conclude the police scrupulously honored Mills' right to cut off questioning. Consequently, Mills' waiver of his *Miranda* rights was not coerced. Upon the facts contained in the record, we conclude that there was no error to justify relief under the unpreserved error rule for death penalty cases set forth in *Sanders, supra.*

The trial court did not abuse its discretion in finding that Mills voluntarily, knowingly, and intelligently waived his *Miranda* rights.

## IV. PRIOR BAD ACTS

Mills argues that improper character evidence in violation of KRE 404(b) was

admitted against him. The disputed evidence was admitted through: (1) the testimony of his wife, Sharon Mills; (2) his former cellmate, Sam Shepherd; and (3) Mills' own confession.

■ The Commonwealth called Sharon as a witness. Prior to her testimony, defense counsel informed the trial court, out of the hearing of the jury, that Mills had been advised of his right to invoke the husband-wife privilege of KRE 504, and that he had declined to exercise the privilege. During the course of her testimony, defense counsel asked to approach the bench after Sharon testified that Mills had asked for her keys to the family van.

At a bench conference, defense counsel stated that Mills was not charged with battery of his wife or his children. The Commonwealth Attorney stated that the evidence, in light of defense counsel's opening argument concerning intoxication and Mills' mental state, was relevant to show Mills' state of mind immediately prior to the murder. Defense counsel agreed that Mills' state of mind was relevant.[1] However, he argued that evidence of state of mind could be extracted through general testimony rather than getting into specifics.

The trial court ruled as follows:
At this point, I will rule that the Commonwealth can address [Mills' state of mind]. [The Commonwealth] should not get into specifics, but ... it may very well be that I will allow this on rebuttal, given [defense counsel's line of questioning during voir dire] and statements and cross-examination that I've heard thus far. But I will on direct limit it, rather order that the Commonwealth limit its questions about the specific activities [that] the defendant ... was engaged in with his wife or children. But I will allow the Commonwealth to ... generally elicit responses from [Sharon] regarding his being upset and his aggressive nature and his very strong desire to use

the vehicle and being upset with her over that.

After the above-described bench conference, the Commonwealth continued questioning Sharon. Thereafter, Sharon stated that John pushed her in an attempt to get the keys to the van. Defense counsel again objected. A bench conference followed in which the Commonwealth's Attorney expressed some confusion caused by the trial court's previous ruling. The trial court reiterated its previous ruling. Following this bench conference, the Commonwealth's Attorney asked Sharon if she and Mills had had a fight. Sharon replied: "No. I wouldn't consider it a fight. It was more of a disagreement, maybe a little tug wrestle." There was no objection to this testimony. Later, Sharon testified concerning a subsequent physical altercation she had with Mills. Specifically, she testified that Mills pushed her down, took the van keys from her, and that Mills tried to pull her out of the van after she had gotten in the driver's side of the van.

On appeal, Mills argues that the trial court erred in failing to exclude the above-outlined testimony. While the trial court's ruling was not a model of clarity, the ruling effectively sustained Mills' objection to the evidence in question by preventing the Commonwealth from eliciting testimony concerning specific acts. In the absence of any challenge or subsequent ruling to the contrary, we assume that the ruling was broad enough to encompass the evidence in question. Thus, the issue before us does not concern whether the trial court's ruling was correct. Rather, the alleged error involves the introduction of testimony, which was contrary to that order, and to which no objection was raised.

Upon the record before us, it appears that the better course for defense counsel would have been to object to Sharon's testimony concerning physical abuse. However, the evidence against Mills was

---

1. It is worth noting that Mills' theory of the case included the defenses of intoxication and extreme emotional disturbance.

absolutely overwhelming. Further, Sharon's testimony of abuse was brief and summary in nature. Thus, we conclude that the totality of the circumstances are not persuasive that, minus the testimony of abuse, Mills would not have been found guilty of a capital crime or that he would not have been sentenced to death. There is no reversible error under *Sanders, supra.*

■ Next, in response to a question by the Commonwealth, Sam Shepherd made a reference to Mills' prior incarceration. That is, Shepherd's testimony was, in effect, that Mills previously had been convicted and imprisoned for some unspecified crime. Mills moved for a mistrial at this point, which was denied by the trial court. However, the trial court did give the jury a general admonition. On appeal, Mills does not argue that the trial court erred in failing to grant a mistrial. Nor does he present any argument to rebut the presumption that the trial court's admonition cured the error. *See Alexander v. Commonwealth,* Ky., 862 S.W.2d 856, 859 (1993), *overruled on other grounds by Stringer v. Commonwealth,* Ky., 956 S.W.2d 883 (1997). Consequently, there is nothing for us to review.

■ Shepherd also testified as follows: Well from what I gathered, that [on] the day ... the murder occurred, [Mills] and his wife had had problems. They was ... fighting over the keys to the van or something, and she finally took him to town. He wanted to go to town and buy some marijuana and apparently they got into a big racket and she finally got away from him.

There was no objection to this testimony. As to the marijuana, it is reasonable that defense counsel did not object to this evidence because it supported Mills' intoxication defense. In fact, defense counsel elicited from a defense witness, Dr. Simon, that, just prior to the murder, Mills went to get a "bag of weed." The remaining testimony is very brief and summary in nature. Further, it is merely cumulative to Sharon's testimony concerning the same incident discussed above. Thus, defense counsel reasonably could have assumed that there was nothing to gain from objecting to Shepherd's brief reference to the confrontation between Mills and his wife over the keys to the van. There is no error under *Sanders, supra.*

■ The last allegation of error concerning Shepherd involves testimony about Mills' behavior while in jail awaiting trial on Phipps's murder. This testimony came in the form of responsive answers to questions posed by the defense in an effort to impeach Shepherd. "One who asks questions which call for an answer has waived any objection to the answer if it is responsive." *Estep v. Commonwealth,* Ky., 663 S.W.2d 213, 216 (1983).

■ Finally, in the videotape of the confession played in full to the jury, Mills says, "Gary Martin I don't like him no way. He sent me to the penitentiary for something I didn't do." Defense counsel did not move *in limine* to redact this statement. Nor did defense counsel object when the videotape was played in court. Defense counsel was aware well before trial of the videotaped confession and its contents. Upon the record before us, it again appears that the better course for defense counsel would have been to move to redact the statement. However, given the overwhelming evidence of Mills' guilt, the totality of the circumstances are not persuasive that, had the videotape been redacted, Mills would not have been convicted of a capital crime. There is no reversible error under *Sanders, supra.*

## V. WAIVER OF COMPETENCY HEARING

■ On November 7, 1995, Mills filed notice of his intention to introduce evidence concerning mental illness, insanity, or mental defect pursuant to KRS 504.070. One month later, the trial court entered an order of psychiatric evaluation which required a psychiatric examination to determine whether Mills was: (1) incompetent

to stand trial as defined by KRS 504.060(4); and (2) insane as defined by KRS 504.060(5). Mills was examined by KCPC psychiatrist Dr. Steven J. Simon, who determined that he was able to understand the nature of the proceedings against him and assist in his own defense.

At a pre-trial hearing on August 2, 1996, the Commonwealth moved the trial court to set a hearing to determine Mills' competency to stand trial. After a lengthy discussion concerning competency, defense counsel stated that competency was not an issue and waived the hearing. On appeal, Mills argues that a competency hearing pursuant to KRS 504.100(3) is mandatory and cannot be waived by a defendant.

■■■■■ Criminal prosecution of a defendant who is incompetent to stand trial is a violation of due process of law under the Fourteenth Amendment. *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992). Further, once facts known to a trial court are sufficient to place a defendant's competence to stand trial in question, the trial court must hold an evidentiary hearing to determine the question. *See Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 385–86, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966). Evidence of a defendant's irrational behavior, his demeanor in court, and any prior medical opinion on competence to stand trial are all relevant facts for a court to consider. *Drope*, 420 U.S. at 180, 95 S.Ct. at 908. KRS 504.100 is entirely consistent with these constitutional requirements.

KRS 504.100(1) requires a court to appoint a psychologist or psychiatrist "to examine, treat and report on the defendant's mental condition" whenever "the court has reasonable grounds to believe that the defendant is incompetent to stand trial." KRS 504.100(3) states that after such a report is filed, "the court shall hold a hearing to determine whether the defendant is competent to stand trial." Section (3) is clearly mandatory.

■■■■ Moreover, United States Supreme Court decisions indicate strongly that a defendant cannot waive a competency hearing. *See Pate*, 383 U.S. at 384, 86 S.Ct. at 841; *Medina*, 505 U.S. at 449–50, 112 S.Ct. at 2579. The competency hearing of KRS 504.100(3) is mandatory and cannot be waived by a defendant. The standard of review in such a case is, "Whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir.1983), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 287 (1983).

On appeal, Mills relies on his psychiatric report to show that he was incompetent to stand trial. However, the report specifically concluded that Mills was competent to stand trial. Thus, the report does not support Mills' argument on appeal. Mills points to nothing else that should have caused the trial court to question his competency to stand trial. Finally, it is clear from the record that the trial judge did not order the psychiatric examination due to a belief that there were reasonable grounds to question Mills' competency to stand trial. Rather, the trial court merely ordered the examination out of expediency in response to Mills' notice of November 7, 1995.

Thus, upon review of the record, we conclude that Mills has failed to establish any factual basis which should have caused the trial court to experience reasonable doubt as to Mills' competence to stand trial. Therefore, we hold that it was harmless error for the trial court to allow Mills to waive the mandatory competency hearing of KRS 504.100(3).

## VI. JURY SELECTION

■■■■ First, Mills argues that the scope of the voir dire was too limited to allow him to adequately question prospective jurors concerning their views on the death penalty. We have carefully reviewed the

questions asked by the court and counsel for both sides during voir dire. The voir dire was clearly sufficient to elicit the potential jurors' views on the death penalty. The scope of the voir dire conformed with, or exceeded, the voir dire approved of in *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 931 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998), wherein the appellant made basically the same argument. This argument has no merit.

■ Next, Mills argues that the trial court erred in failing to strike two jurors for cause because of their views toward alcohol and drug abuse. Whether a juror should be excused for cause is within the sound discretion of the trial court. *Id.* The trial court's decision will not be disturbed absent a clear abuse of discretion. *Id.* Further, the issue of how alcohol and drug abuse can serve as a "defense" to an intentional crime and can serve to mitigate punishment can be confusing to a lay person. *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668, 670 (1994). Upon careful review of the voir dire we cannot say that the trial court abused its discretion in denying Mills' motions to strike these two jurors for cause. There was no error.

■ Finally, Mills argues that the trial court improperly excused one juror for cause. On appeal, Mills seems to argue that she was excused solely because she was equivocal as to whether she could impose the death penalty. However, the trial court's ruling makes clear that she was excused because of the nervousness she exhibited in response to questions by the court and counsel and because of a partial medical excuse which stated that she had a nervous disorder. We have carefully reviewed the voir dire of the juror in question. The trial court did not abuse its discretion in granting the Commonwealth's motion to strike the juror in question for cause.

## VII. VIDEOTAPE OF THE CRIME SCENE

■ A videotape of the crime scene was introduced pursuant to the testimony of Detective Partin. During the playing of the videotape, Partin commented on the images being displayed. Additionally, the videotape shows images of the victim. There was no objection to the playing of the videotape, nor was there any objection to Partin's commentary.

Prior to the playing of the videotape, the following exchange between Partin and the Commonwealth's Attorney (CA) occurred:

CA: During your state police training, have you been trained in the science of understanding blood patterns?

Partin: Yes sir.

CA: In doing so, are blood spatters part of the training?

Partin: Yes sir.

CA: Explain to the jury what that is.

Partin: Blood spatter training is when you look at the pattern of blood on an object and being able to see how that pattern may have gotten there. For instance, in a lot of stabbing cases, for instance, if someone is stabbing someone they would bring the knife back this way, blood would be in like a streak, a dotted streak. That's called "cast off." Other type of spatters would be like swabs of hair—hair type imprints against … walls, that type of thing. Blood drops would be able to tell … whether this was a drop coming straight down or [were] drops coming from a moving object.

Mills argues that this testimony was insufficient to establish Partin's qualifications as an expert witness in blood spatter evidence. We note that defense counsel did not object to Partin's qualifications as an expert witness. While the trial court did not expressly recognize Partin as an expert witness, by allowing Partin to testify concerning blood spatter evidence, the trial court ruled by implication that Partin was so qualified. *Guyther v. Nationwide*

*Mutual Fire Insurance Company,* 109 N.C.App. 506, 428 S.E.2d 238, 243 (1993).

While we believe that Partin was qualified to render expert testimony on blood spatter evidence, assuming arguendo that Mills is correct, the error was harmless. Partin referred to blood spatter evidence only once during the narrative of the videotape. Referring to blood spots seen on a wall in a particular room, Partin concluded that Phipps was attacked in this room with a knife. This conclusion was based on his interpretation of the blood spots, which he characterized as being "cast off." There was no dispute that Phipps was stabbed repeatedly. Given all the other evidence linking Mills to the murder and to the house, testimony that Phipps was stabbed with a knife in a particular room hardly could have been prejudicial to Mills' case.

■ The rest of Partin's testimony in connection with the narration of the videotape did not rely on any blood spatter expertise. Rather, it is based on Partin's own personal observations and perceptions of the crime scene. Thus, we examine the rest of the challenged testimony to determine whether it was proper lay testimony.

On appeal, Mills argues that Partin improperly speculated that the video showed: (1) where three different attacks occurred; (2) where the first attack occurred; (3) where Mills took something from a vase; (4) where Mills left a boot print on a door; and (5) that a particular wood chip came from a certain hoe handle. Mills argues that these allegedly improper speculations invaded the province of the jury and, further, only served to inflame the jury. Because there was no objection to this testimony, we review these allegations of error pursuant to *Sanders, supra.*

KRE 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(a) Rationally based on the perception of the witness; and

(b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

However, KRE 701 must be read in conjunction with KRE 602, which limits a lay witness's testimony to matters to which he has personal knowledge.

Initially, we note that Mills' suggestion on appeal that Partin identified him, by name, in the challenged testimony is not supported by the record. During his commentary of the videotape, Partin never referred to Mills by name as the person who attacked Phipps, as the person who left a boot print on the door, or who took something from a vase. Rather, Partin, who examined the crime scene and was present when the videotape was made, testified to the locations where Phipps was attacked, without naming the attacker. With the exception of the brief reference to blood spatter evidence outlined above, Partin's testimony as to the location of where the attacks occurred was rationally based on his perceptions of the crime scene, *e.g.,* the pooling and the amount of blood evidenced on the videotape. Nor did Partin state that Mills took something out of a vase. Rather, Partin testified merely that "he"—without any reference to the pronoun—took something from a vase.

As to Partin's testimony regarding the boot print, Partin testified that a "dry boot print" could be seen on a door in response to a question concerning how the door was forced open. Finally, in pointing out the wood chip seen on the videotape, Partin stated that it probably came from a hoe handle, which was previously introduced into evidence and was physically in front of him at the time.

On review of the challenged testimony, we conclude that it comprised opinions and inferences that were rationally based on Partin's own perceptions of which he had personal knowledge. Further, we conclude the testimony was helpful to the jury in evaluating the images displayed on the videotape. Thus, we conclude that the challenged testimony did not violate the

limitations of KRE 701 and KRE 602. The challenged portion of Partin's testimony was not in error.

■ Next, Mills argues that the display of Phipps's body should have been excluded because its probative value was substantially outweighed by the danger of undue prejudice. KRE 403. Upon review of the tape, we conclude that the "videotape evidence does not fall outside of the broad category of photographs which we have found admissible under a liberal approach recognized in *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 106 (1980), and continued through *Wager v. Commonwealth*, Ky., 751 S.W.2d 28, 31 (1988)." *Milburn v. Commonwealth*, Ky., 788 S.W.2d 253, 257 (1989). There was no error.

## VIII. EXCLUSION OF EVIDENCE

■ Mills presents nine questions asked of a number of witnesses to which the trial court sustained the Commonwealth's objection on hearsay grounds. Mills argues that by preventing the witnesses from responding to these questions, the trial court denied him due process of law by depriving him of the opportunity to present a defense. Mills does not argue that the trial court's rulings were incorrect. Rather, he relies on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), wherein the Supreme Court held, "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. at 1049. Mills' reliance on *Chambers* is misplaced.

In *Chambers*, the appellant was convicted of shooting a police officer to death. *Id.* at 285, 93 S.Ct. at 1041. Mississippi's evidentiary rules in question utterly prevented the appellant from putting on evidence that one Gabe McDonald had made a sworn confession to the murder and that McDonald had made statements to others implicating himself as the shooter. This evidence was excluded either as hearsay or because it violated the rule, in effect in Mississippi at that time, that a party may not impeach his own witness, or on both grounds. *Id.* at 294, 93 S.Ct. at 1045.

In the case at bar, Mills has made no showing that the trial court's ruling prevented him from introducing the evidence he sought to put before the jury. Mills has only shown that the trial court prevented him from introducing the evidence through hearsay. *Chambers* holds that application of evidentiary rules cannot be applied so as to completely bar all avenues for presenting a viable defense. It does not hold that evidentiary rules cannot be applied so as to properly channel the avenues available for presenting a defense. Exclusion of the testimony in question did not violate Mills' right to due process of law.

## IX. DIRECTED VERDICT

Mills argues that the trial court erred in denying his motions for directed verdicts of acquittal on the charges of first-degree burglary and first-degree robbery. Specifically, Mills argues that there was no evidence introduced that he entered Phipps's residence without permission, or that he entered Phipps's residence to commit a crime. Further, he argues that there was no evidence introduced to show that Mills committed the charged crimes after his license to remain in Phipps's residence expired. Next, Mills argues that there was no evidence introduced to show that he used physical force on Phipps with the intent to accomplish theft, as is required by KRS 515.020.

■ "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991).

■ Mills was convicted of first-degree burglary on grounds that he remained in Phipps's house or on his property without

permission with the intention of committing a crime, *i.e.*, theft. *See* KRS 511.020. His argument on appeal is contrary to *Tribbett v. Commonwealth*, Ky., 561 S.W.2d 662 (1978), in which we held that the license of invitees expired at the death of the victim, and, thus, when the invitees stayed on the premises after the victim's death they remained unlawfully on the premises within the meaning of KRS 511.020. *Id.* at 663. The videotape of the crime scene and Partin's testimony as to the relevant sequence of events presented ample evidence that Mills remained on the premises with the intention of committing a crime after his license expired upon Phipps's death.

■ Concerning the lack of evidence to show the use of physical force with the intent to accomplish theft, we note that intent can be inferred from the act itself and the surrounding circumstances. *Stevens v. Commonwealth*, Ky., 462 S.W.2d 182, 184 (1970); *Lambert v. Commonwealth*, Ky.App., 835 S.W.2d 299, 301 (1992). Again, the videotape and Partin's testimony presented sufficient evidence for the Commonwealth to survive a directed verdict under *Benham*. Further, Sam Shepherd testified that Mills told him that he "went up there to rob the old man." Viewing this evidence in the light most favorable to the Commonwealth, *id.*, we conclude that Mills was not entitled to a directed verdict on either charge.

## X. GUILT PHASE INSTRUCTIONS

Mills argues that the trial court erred because it failed to: (1) give a separate instruction on intoxication; (2) give an instruction on theft; (3) give definitions of reasonable doubt and the Commonwealth's burden of proof; and (4) give a definition of "Enter or Remain Unlawfully." Additionally, Mills argues that the instruction on presumption of innocence was constitutionally deficient.

We begin our discussion on these issues by noting that neither the Commonwealth, nor the defense, tendered instructions to the trial court. Moreover, defense counsel only objected to failure to define "Enter or Remain Unlawfully." He did not object to any of the other defects in the instructions alleged on appeal. Thus, these issues are unpreserved and are reviewed under the standard set forth in *Sanders, supra.*

The instruction on intentional murder, of which Mills was convicted, states:

You will find the Defendant guilty of Murder under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about August 30, 1995 ... he killed Arthur L. Phipps by stabbing him with a knife and striking him with a blunt object;

B. That in so doing, he caused the death of Arthur L. Phipps intentionally and not while acting under the influence of extreme emotional disturbance;

AND

· C. That at the time he committed the offense of murder he was not so intoxicated that he did not form the intention to commit the offense.

■ Whenever a defendant adduces sufficient evidence of voluntary intoxication, the defendant is entitled to an instruction on the defense of intoxication. *Brown v. Commonwealth*, Ky., 575 S.W.2d 451, 452 (1978). The instruction should be given separately in substantially the following form:

Although you might otherwise find the defendant guilty of murder under Instruction [y] or first degree manslaughter under Instruction [z], if at the time he killed X (if he did so) he was so drunk that he did not have the intention of committing a ·crime, you shall find him not guilty under those instructions.

*Id.* Thus, under *Brown*, the trial court should ·have given a separate instruction on intoxication that follows the model form. However, this does not end the inquiry.

In both *Mabe*, 884 S.W.2d at 672, and *Slaven v. Commonwealth*, Ky., 962 S.W.2d 845, 857 (1997), the appellants were each given separate instructions on voluntary intoxication in the model form. The appellant in *Mabe* argued "that an instruction on intoxication should have been included within the instructions for intentional murder and first-degree manslaughter rather than as a separate instruction." *Mabe*, 884 S.W.2d at 672. The appellant in *Slaven* refined the argument and claimed "that since the Commonwealth has the burden to disprove the defense of intoxication, ... the absence of intoxication should have been included as an element of the offense of murder." *Slaven*, 962 S.W.2d at 857.

In *Mabe*, we relied on *Brown*, *supra*, to hold that there was no error in giving a separate instruction. *Mabe*, 884 S.W.2d at 672. We relied on both *Mabe* and *Brown* to reach the same holding in *Slaven*. *Slaven*, 962 S.W.2d at 857. As we explained in *Slaven* :

> However, it is the presence of intent, not the absence of intoxication, that is the relevant element of the offense. If intoxication negates intent, it would be redundant to instruct the jury that the Commonwealth must prove both intent and the absence of intoxication. Compare the defense of self-protection, which does not negate an element of the offense, but provides a justification for committing the other elements of the offense. The separate instruction on intoxication explains to the jury how that defense affects the element of intent. It is unnecessary to repeat that explanation in the instruction on the primary offense.

*Id.* (internal citations omitted). Thus, *Slaven* holds that inclusion of the intoxication instruction within the instruction on the principal offense is not necessary. It does not hold that to do so is error.

In any event, assuming error *arguendo*, it is reasonable to conclude that the failure to object to the intoxication instruction was a legitimate trial tactic. That is, defense counsel may well have determined that the inclusion of the intoxication instruction as an element of the offense in the murder instruction was more beneficial to Mills than a separate intoxication instruction would have been. Moreover, Mills has offered no credible argument as to how the failure to ask for a separate instruction on intoxication prejudiced his case. There is no possible reversible error under *Sanders, supra*.

■ Next, Mills argues that it was error for the trial court to instruct the jury on theft. In the videotaped confession, Mills denied taking anything from Phipps. The jury found otherwise. No reasonable juror could have found that Mills did not use force or the threat of force to deprive Phipps of his property. The argument has no merit.

■ Next, Mills argues that the trial court should have defined "reasonable doubt" and the Commonwealth's burden of proof. Mills makes no mention of RCr 9.56(2), which prohibits definition of reasonable doubt in the instructions. Moreover, a definition of "reasonable doubt" is not constitutionally required. *Perdue*, 916 S.W.2d at 161. Further, the first instruction clearly establishes the Commonwealth's burden of proof. The argument is without merit.

■ Next, Mills argues that the trial court should have defined "Enter or Remain Unlawfully" because the term, as it appeared in the first-degree burglary instruction, was confusing to the jury. We presume that the jury consisted of persons of common sense. The argument is without merit.

Finally, Mills argues that the instruction on the presumption of innocence was constitutionally deficient. The instruction is identical to the model instruction found in 1 Cooper, *Kentucky Instructions to Juries (Criminal)*, § 2.02. This form of instruction has repeatedly been found sufficient by this Court. *Id* . (citing *Commonwealth v. Callahan*, Ky., 675 S.W.2d 391 (1984)).

Again, the argument is utterly without merit.

## XI. PROSECUTORIAL MISCONDUCT

Mills argues that a number of comments made by the Commonwealth's Attorney in his closing arguments in both the guilt and penalty phases were improper and only served to inflame the jury. No objection was made to any of these remarks. Upon careful review of the record, we conclude that the Commonwealth's Attorney's closing arguments fell within the great leeway allowed to both sides during closing argument. *See Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407, 412 (1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). There was no error.

## XII. PENALTY PHASE INSTRUCTIONS

Mills raises nineteen (19) errors in the penalty instructions. Most of these allegations of error are, in reality, invitations to overturn long-established precedent. No objection to any of these instructions was made to the trial court.

■ The verdict forms did not, in effect, direct the jury to sentence Mills to death or life without possibility of parole for twenty-five (25) years upon finding the existence of an aggravating factor beyond a reasonable doubt. The Instruction on Authorized Sentences states in the last paragraph, "However, even if you are satisfied from the evidence beyond a reasonable doubt that one or more of the aggravating circumstances is true, you are not required to impose life without benefit of probation or parole for a minimum of 25 years or death." This instruction clearly informed the jury that, despite the finding of one or more aggravators, it could fix Mills' sentence at the authorized sentences of a term of years of twenty (20) years or more, or imprisonment for life. *See Perdue,* 916 S.W.2d at 168 (upholding similar instructions).

A number of identical issues were raised in *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999). To these same arguments, we stated:

The instruction on mitigating circumstances included the catch-all provisions, "any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value," and "those aspects of the defendants' character and the facts and circumstances of the offense about which he has offered evidence in mitigation." There was no need to instruct on any specific nonstatutory mitigators. *Haight v. Commonwealth,* Ky ., 938 S.W.2d 243 (1996); *Perdue v. Commonwealth,* Ky., 916 S.W.2d 148 (1995), *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); *Sanders v. Commonwealth, supra.* The instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous. *Bowling v. Commonwealth, supra,* 873 S.W.2d at 180. Nor is there a constitutional requirement to provide a formal definition of mitigating circumstances or their function. "Jury instructions at the sentence stage of a capital trial need not include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances." *Waters v. Thomas,* 46 F.3d 1506, 1528 (11th Cir.1995), *cert. denied,* 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995).

... Since a jury is not required to make findings with regards to mitigators, but only to consider them, there is no need to define the standard of proof. *Cf. Bowling v. Commonwealth, supra,* 873 S.W.2d at 180; *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985), *cert. denied,* 502 U.S. 844, 112 S.Ct. 140, 116 L.Ed.2d 106 (1991). Nor is there any requirement to instruct the jury on "residual doubt" as a mitigating

factor. *Bussell v. Commonwealth, supra,* 882 S.W.2d at 115.

*Id.* at 37–38.

■ Contrary to Mills' argument on appeal that evidence of parole eligibility should have been admitted during the penalty phase, it would have been clear, reversible error to admit such evidence. *Perdue,* 916 S.W.2d at 164. An instruction to the jury to avoid passion or prejudice in fixing the death penalty is not required. *Id.* at 169. The trial court was not required to sua sponte instruct the jury that the defendant has a right not to testify in the penalty phase and no adverse inference shall be drawn from his failure to do so. *Ice v. Commonwealth,* Ky., 667 S.W.2d 671, 677 (1984), *cert. denied,* 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). A jury is not required to weigh mitigating factors against aggravating factors. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293, 306 (1997), *cert. denied,* ——— U.S. ———, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997). The law does not require a jury to be instructed that a sentence of death would result in his electrocution. *Id.*

Additionally, Mills argues that: (1) the instructions limited the jury's consideration of mitigation to evidence adduced at the penalty phase; (2) the instructions directed the jury to find the existence of aggravating circumstances; and (3) the instructions failed to limit the jury's consideration of the aggravating circumstances to those listed. We have reviewed the instructions and have determined that these arguments have no merit. Likewise, his argument that the trial court should have granted a directed verdict on mitigating circumstances is without merit. Any other arguments concerning the penalty phase instructions not listed above have been reviewed and are devoid of any merit.

### XIII. COMMENTS TO THE JURY

■ The jurors retired to deliberate at 4:42 p.m. At 9:27 p.m., the jury returned to the courtroom with a question. The trial court noted that it had received the question, but did not repeat it for the record.

The record does not otherwise reflect what the question was. The trial court responded to the question by telling the jurors that they could quit for the night, in which case they would be sequestered, or that they could take a break, eat dinner, and continue their deliberations. The jurors elected the second option. After a short break, they returned to the jury room to deliberate at 9:54 p.m. The jury returned to the courtroom with a death verdict at 3:58 a.m. Mills argues that the choice of sequestration or deliberation coerced the jury into returning a sentence of death.

We note that while the exact question is not known, careful examination of the portion of the videotape at issue reveals that the jury did not inform the trial court that it was deadlocked. Had it done so, the trial court's comments to the jury would have violated RCr 9.57. Of course, comments made in violation of RCr 9.57 do not create reversible error *per se. Commonwealth v. Mitchell,* Ky., 943 S.W.2d 625, 627 (1997). When such an error occurs, the focus on appeal is whether the comment itself was coercive. *Id.* We believe that in this situation the focus is likewise on whether the comment was coercive. The difference in the two situations is that a violation of RCr 9.57 always results in error, which is subject to a harmless error analysis, whereas a response by the trial court to a question by the jury after it has begun to deliberate only results in error if the comment is in fact coercive.

In *Tarrence v. Commonwealth,* Ky., 265 S.W.2d 40 (1953), *cert. denied,* 348 U.S. 899, 75 S.Ct. 220, 99 L.Ed. 706 (1954), a deputy sheriff repeatedly asked the jury, under direction of the trial court, whether they wanted to continue deliberations or whether wanted to go to a hotel for the night. *Id.* at 52. The jury preferred to remain. *Id.* In finding no coercion, the Tarrence Court emphasized, "[I]t is manifest from the record that [the decision to continue deliberations] was the express preference of the jury and there was no objection." *Id.* There was even less possi-

bility of coercion in the case at bar. The trial court merely responded to a legitimate question from the jury. It did not, as was done in *Tarrence,* disrupt jury deliberations by interjecting the question of whether the jurors wanted to continue or retire to a hotel. Further, the jury clearly indicated that they wanted to continue. There was no error.

## XIV. DOUBLE JEOPARDY

■ "[F]irst-degree burglary, first-degree robbery and murder are three separate offenses." *Kinser v. Commonwealth,* Ky., 741 S.W.2d 648, 654 (1987). Nonetheless, Mills makes three different double jeopardy arguments based on his convictions for these three separate offenses. He relies primarily on *O'Hara v. Commonwealth,* Ky., 781 S.W.2d 514 (1989).

■ The test to determine whether a prosecution for two different offenses results in violation of constitutional and statutory double jeopardy principles is set forth in *Commonwealth v. Burge,* Ky., 947 S.W.2d 805 (1996), *cert. denied,* — U.S. ——, 118 S.Ct. 422, 139 L.Ed.2d 323 (1997). "We are to determine whether the act or transaction complained of constitutes a violation of two distinct statutes and, if it does, if each statute requires proof of a fact the other does not." *Id.* at 811. *O'Hara* stands for the proposition that the double jeopardy analysis of *Burge* has to take into account both the offenses charged in the indictment and the jury instructions. *Accord Butts v. Commonwealth,* Ky., 953 S.W.2d 943, 945 (1997). In the case at bar, Mills only includes the jury instructions in his argument.

The relevant elements in the jury instruction on the murder convictions are:

A. [Mills] killed Arthur L. Phipps by stabbing him with a knife and striking him with a blunt object;

B. That in so doing, he caused the death of Arthur L. Phipps intentionally
. . . .

The relevant elements in the jury instructions on the first-degree burglary instructions are:

A. [Mills] remained in a building owned by Arthur L. Phipps without permission . . . .

B. That in so doing, he knew he did not have such permission;

C. That he did so with the intention of committing a crime therein;

D. That in effecting entry or while in the building or in immediate flight therefrom, he used or threatened the use of a dangerous instrument against Arthur L. Phipps and/or caused physical injury to Arthur L. Phipps. . . .

The relevant elements in the jury instructions on the first-degree robbery conviction are:

A. [Mills] stole prescription drugs; and/or a change-purse and its contents; and/or keys from Arthur L. Phipps;

B. That in the course of so doing with intent to accomplish the theft, he used physical force upon Arthur L. Phipps;

C. That when he did so, he was armed with a knife and a blunt object;

Thus, applying the same-elements test of *Burge* to the instructions set forth above, we conclude that convictions for these three offenses do not violate double jeopardy principles. The murder instruction requires proof of Phipps's death, which element is not required by the instructions on burglary or robbery. Next, the burglary instruction requires proof that Mills remained on Phipps's property without permission and that he knew that he did not have permission, which elements are not required by the instructions on murder and robbery. Finally, the robbery instruction requires proof that Mills stole certain items from Phipps, which element is not required by the instructions on murder and burglary.

■ Finally, Mills argues that the reuse of the robbery and burglary convictions at the guilt phase cannot be used to prove aggravating circumstances for murder at the penalty phase. This same argument was raised and rejected in *Bowling,* 942 S.W.2d at 308.

## XV. RATIONAL SENTENCING

Mills argues that he did not receive a rational sentence because the trial court: (1) considered a non-statutory aggravator, specifically the heinousness of the crime; (2) failed to consider mitigators; (3) failed to make findings as to mitigators; and (4) failed to articulate its role in the sentencing procedure.

■ In response, we note the following: (1) Unlike the jury, "the trial court is not limited to statutory aggravating circumstances." *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414, 423 (1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986). Further, we found no error in the trial court's consideration of the heinous nature of the murder as a nonstatutory aggravating circumstance. *Tamme*, 759 S.W.2d at 55; (2) Review of the record reveals that the trial court did consider mitigating circumstances; (3) The trial court is not required to make specific findings as to mitigating circumstances. *Bowling*, 942 S.W.2d at 306; (4) The trial court acted within its discretion in upholding the jury's recommended sentence of death. "The contention that there is no properly articulated standard of review for the trial court in such a circumstance is without merit." *Id.*

## XVI. OTHER ISSUES

■ "Imposition of the death penalty does not violate the constitutional proscription against cruel and unusual punishment. Nor is its application arbitrary in view of the guidelines for its imposition provided by KRS 532.025 and KRS 532.075. Death by electrocution is not cruel and unusual punishment." *Tamme*, 973 S.W.2d at 40 (internal citations omitted). Failure to provide access to data collected by this Court pursuant to KRS 532.075(6) did not deny Mills due process of law. *Harper v. Commonwealth*, Ky., 694 S.W.2d 665, 671 (1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Mills' argument that Kentucky's proportionality review violates due process of law is without merit. It is not unconstitutional to "death qualify" a jury. *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872, 890 (1992) (citing *Lockhart v.. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)). Mills' argument that the use of a videotaped record denied him effective assistance of appellate counsel is without merit.

## XVII. KRS 532.075(3) REVIEW

■ Pursuant to KRS 532.075(3), we have reviewed this record and determined that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. There was ample evidence to support the finding of the aggravating factors of first-degree robbery and first-degree burglary. We have also reviewed all cases decided since 1970 in which the death penalty was imposed. We have particularly considered those in which a defendant was sentenced to death for intentional murders unaccompanied by other criminal behavior directed toward the victims, e.g., burglary, robbery, rape, etc., viz: *Foley*, 942 S.W.2d 876; *Bowling*, 873 S.W.2d 175; *Haight v. Commonwealth*, Ky., 938 S.W.2d 243 (1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 110, 139 L.Ed.2d 63 (1997); *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835 (1990), *cert. denied*, 502 U.S. 1065, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992); *Smith v. Commonwealth*, Ky., 734 S.W.2d 437 (1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988); *Slaughter*, 744 S.W.2d at 415; *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 963, 93 L.Ed.2d 1010 (1987); *Harper*, 694 S.W.2d 665 (1985) (two murders); and *McQueen v. Commonwealth*, Ky ., 669 S.W.2d 519 (1984), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). On the basis of this review, we have determined that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.

For the foregoing reasons, the judgment of the Knox Circuit Court is affirmed.

All concur.