Naomi Riley TURNER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2001–SC–1054–MR.

Supreme Court of Kentucky.

Jan. 20, 2005.

Julie Namkin, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice JOHNSTONE.

Appellant, Naomi Riley Turner, was found guilty of wanton murder, burglary in the second degree, and theft by unlawful taking. She was sentenced to twenty-five years, ten years, and five years, respectively, to run consecutively for a total of forty years. Appellant now appeals as a matter of right, raising six claims of error.

For the reasons set forth below, we affirm in part and vacate and remand in part.

## I. Facts

Beecher Russell was discovered dead in his home on the evening of March 21, 1999, by his neighbor. The house was in disarray at that time: the telephone was jerked from the wall, a lamp was shattered, and a ceiling light was broken. Police photographs of Mr. Russell's body show that his pants were torn and there were blood stains on his clothes. A pair of scissors and a knife were found beneath his body. An autopsy revealed a laceration of the scalp and an abrasion to the wrist. Furthermore, the autopsy concluded that Mr. Russell had suffered from coronary artery disease and that he had died of a heart attack. The remainder of facts material to this case were disputed at trial.

According to Appellant's version of events, she went to Mr. Russell's home on March 20, 1999, with her girlfriend and co-indictee, Jean Crittendon. Their intent was to borrow money and possibly a car from Mr. Russell in order to go across the county line for liquor. Tom Crittendon, Jean's son, accompanied them. Jean knocked on Mr. Russell's door while Appellant and Tom waited outside. Mr. Russell, who had known Jean for a number of years, invited Jean inside. As Jean was asking Mr. Russell for the money and vehicle, Appellant and Tom entered through a back door.

Appellant claims that Jean and Mr. Russell then got into an argument when he refused to lend her either the car or any money. Jean reached into Mr. Russell's pocket and was able to remove his car keys, although he pulled away and his pants tore at the pocket seam. Meanwhile, Tom pulled the telephone from the wall and broke the lamp and ceiling light. Jean and Mr. Russell continued to argue while Appellant went outside. Moments later, Jean exited the house with the car keys and Mr. Russell's wallet, and the two left in his car. Tom was present while these events occurred, but he did not leave in Mr. Russell's car with Appellant and Jean.

Jean's version of events differs significantly. According to Jean, she asked Mr. Russell to borrow his car and some money, but he declined. At that point, Tom left. Thereafter, Appellant became upset at Mr. Russell's refusal to lend the car or money, and persisted in demanding both. Appellant then ordered Jean to remove Mr. Russell's keys from his pocket. Jean did as she was told, and as she removed the keys, Mr. Russell's pants tore. At that moment, Jean testified that Mr. Russell's face grew ashen and his breathing became labored. However, Appellant ordered Jean outside and into the car, and Appellant remained alone in the house with Mr. Russell. Moments later, Appellant emerged with the wallet and the pair left in the car.

On April 23, 1999, Tom Crittendon, Jean Crittendon, and Appellant were jointly indicted by the Breathitt County Grand Jury for wanton murder, first-degree burglary, and theft. Jean pled guilty to all charges. Appellant pled not guilty, was tried and found guilty of wanton murder, burglary, and theft.

## II. Trial Court's Failure to Direct a Verdict

■■■ Appellant first claims that the trial court erred when it denied her motion for a directed verdict on the wanton murder charge. According to Appellant, the Commonwealth failed to prove every element of wanton murder, thereby requiring a directed verdict in her favor. On appellate review of a motion for a directed verdict, we must analyze the evidence as a whole, and determine if it was clearly un-

reasonable for the jury to find guilt. If so, then the defendant is entitled to a directed verdict of acquittal. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). Here, we conclude that the evidence was insufficient to sustain a wanton murder conviction, and therefore the trial court erred in denying Appellant's motion for a directed verdict.

Appellant was convicted of murder pursuant to KRS 507.020(1)(b), which states that a person is guilty of murder when "under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 501.020(3) defines "wantonly" as follows:

A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

In ruling on a motion for a directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth, and then determine if such evidence is sufficient to induce a reasonable juror to find guilt beyond a reasonable doubt. *Benham*, 816 S.W.2d at 187. Here, we believe that the evidence, even when construed in the Commonwealth's favor, was insufficient to support a finding of guilt beyond a reasonable doubt because there was simply no evidence that Appellant behaved wantonly, as defined by KRS 501.020(3).

The Commonwealth's evidence revealed the following version of events. Jean Crittendon testified that Appellant directed her to remove Mr. Russell's keys from his pocket, which she did. Jean claimed that Mr. Russell, at that point, began to turn white and his breathing changed. However, Appellant then ordered Jean to wait in the car and remained alone in the house with Mr. Russell. Jean testified that, when she left the house, it was not disturbed and that Mr. Russell did not bear any external injuries. Therefore, because the house was found later in disarray, it is fair to infer that Appellant disrupted the house. It is also reasonable to infer that, when she left the home, Mr. Russell appeared to be having a heart attack.

To find Appellant guilty of wanton murder, the jury was required to conclude that Appellant acted wantonly in ordering Jean to take Mr. Russell's keys. The definition of wanton found in KRS 501.020(3) requires a finding that Appellant was aware of and consciously disregarded the risk of Mr. Russell's death. After reviewing the record, we conclude that the Commonwealth failed to satisfactorily establish this element of the crime. No evidence was presented that Appellant was aware of Mr. Russell's heart condition; in fact, Mr. Russell's own son testified that even he was unaware of his father's condition. Nor can it be argued, as the Commonwealth maintains, that Appellant should have been aware that her conduct would cause Mr. Russell to have a heart attack. The testimony of Mr. Russell's son revealed that Mr. Russell outwardly appeared to be a healthy man, and in fact was seen chopping wood in his front yard mere days before his death. It is simply an impermissible leap of logic to conclude that a reasonable person engaging in Appellant's conduct—that is, ordering another to remove a set of keys from the pocket of the resisting owner—would be or should be

aware that death by heart attack might result.

We also believe that the Commonwealth failed to provide sufficient evidence to support the conclusion that Appellant's conduct manifested the requisite extreme indifference to human life. The official commentary to KRS 507.020 lists the following actions as examples of wanton conduct: "shooting into a crowd, an occupied building or an occupied automobile; placing a time bomb in a public place; or derailing a speeding locomotive." Wanton murder charges are sustained by this Court where the defendant engages in conduct that exhibits an extreme indifference to the risk of death or injury. In *Hamilton v. Commonwealth,* 560 S.W.2d 539 (Ky.1978), a wanton murder conviction was upheld where the defendant drove his vehicle while extremely intoxicated, barreling through an intersection against the red light, and struck and killed another motorist. Similarly, in *Estep v. Commonwealth,* 957 S.W.2d 191 (Ky.1997), the defendant behaved wantonly where, under the influence of five separate prescription drugs, she drove her pickup truck down the left side of a two-lane highway, hitting head-on and killing another driver. In *Nichols v. Commonwealth,* 657 S.W.2d 932 (Ky.1983), this Court concluded that a wanton murder charge could be sustained where the defendant had fired a loaded pistol into an occupied vehicle. A wanton murder conviction was not permitted to stand where a defendant, driving a loaded coal truck, struck and killed another motorist where there was no evidence that the defendant was speeding, intoxicated, or running a red light. *Johnson v. Commonwealth,* 885 S.W.2d 951 (Ky.1994). "This Court has held that a conviction of wanton murder is reserved exclusively for offenders who manifest virtually no concern for the value of human life." *Johnson,* 885 S.W.2d at 952. We do not be-

lieve that the Commonwealth presented evidence to establish that Appellant's conduct manifested an extreme indifference to human life. Appellant ordered Jean Crittendon to take Mr. Russell's keys against his will, the shock and stress of which caused the elderly man to have a heart attack and die. While Appellant may be criminally liable for the resulting death, we cannot conclude that this act alone manifests an extreme indifference to human life.

■ Justice Graves' dissent suggests that the "thin skull" or "eggshell plaintiff rule," a basic concept of tort law, should have some applicability to criminal law and to this case. No authority is cited for this proposition because there is none. The suggestion confuses the separate functions of tort law and criminal law. Tort law is primarily concerned with the economic compensation of the victim or plaintiff. Dan B. Dobbs, *The Law of Torts,* Part I, Topic A, § 1 (West Group 2001). Thus, a negligent actor is "liable for all damages proximately resulting from the negligent act." *Leslie v. Egerton,* 445 S.W.2d 116, 119 (Ky.1969). On the other hand, criminal law is concerned primarily with the "state's interests in the security of *society.*" Dobbs § 2 (emphasis added). Thus, one of the main purposes of criminal law is to deter people from engaging in conduct that threatens that security. *Model Penal Code* § 1.02(1)(2001). This explains why, in criminal law, creating the risk of harm itself can be a punishable offense. Conversely, in tort law, without harm—*i.e.,* damages—there is no case.

It is the Appellant's awareness and disregard of the risk of causing death that is largely at issue here; the issue is not whether Appellant's actions were the legal cause of Mr. Russell's death. To be guilty of wanton murder, the level of awareness

the Commonwealth must prove is reflected in KRS 501.060(3), which states that "[w]hen wantonly ... causing a particular result is an element of an offense, *the element is not established if the actual result is not within the risk of which the actor is aware.*" (Emphasis added). Our holding is founded, in part, on the conclusion that the Commonwealth failed to demonstrate that Appellant was aware that her actions risked causing Mr. Russell's death. In tort law, Appellant's awareness of the risk that her actions posed may not be requisite to a determination of her liability. However, in criminal law, Appellant's awareness of the risk of Mr. Russell's death is an element of the crime of wanton murder and, without proof of that element, the conviction may not stand.

We conclude that the Commonwealth presented insufficient evidence to establish that Appellant was aware that her directive to Jean would create a risk to Mr. Russell's life. Furthermore, we conclude that the Commonwealth failed to present adequate evidence that Appellant's actions manifested an extreme indifference to human life. Therefore, the trial court erred in failing to direct a verdict of acquittal on the wanton murder charge. Accordingly, we reverse Appellant's wanton murder conviction.

### III. Introduction of Bad Character and Bad Acts Evidence

■ Appellant makes a two-part argument concerning the introduction of evidence relating to bad character and prior bad acts. First, Appellant claims that the trial court erred in denying her motion for a mistrial when Jean Crittendon testified regarding Appellant's demeanor at the time of the crime. Specifically, the Commonwealth questioned Jean about the look on Appellant's face when she ordered Jean to take Mr. Russell's keys. Jean responded that Appellant looked mean. The Com-

monwealth then asked Jean if she had ever seen that look or demeanor from Appellant in the past. Jean replied that, in previous times when Appellant displayed a similar demeanor, Appellant usually became violent.

A pretrial motion in limine to exclude bad acts and bad character evidence was granted by the trial court. Defense counsel objected to this testimony, and requested a mistrial. The trial court recognized that Jean's testimony amounted to evidence of bad acts, but declined to grant a mistrial. Instead, the trial court believed any prejudice could be cured through an admonition to the jury to disregard Jean's comments regarding Appellant's demeanor.

■ A mistrial is an extreme remedy to be utilized only when the record reveals a "manifest necessity" for such action. *Kirkland v. Commonwealth*, 53 S.W.3d 71, 76 (Ky.2001). The decision of the trial court concerning a motion for mistrial should only be disturbed where there is an abuse of discretion. *Clay v. Commonwealth*, 867 S.W.2d 200, 204 (Ky.App.1993). We find no abuse of discretion here. The trial court recognized the improper nature of the Commonwealth's line of questioning, and admonished the jury from considering Jean's statements. "It has long been the law in Kentucky that an admonition to the jury to disregard an improper argument cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Price v. Commonwealth*, 59 S.W.3d 878, 881 (Ky.2001). Here, the bulk of the testimony admitted at trial essentially created a credibility contest between Appellant and Jean Crittendon. Therefore, in light of the testimony presented by both sides concerning the history of the two women's relationship, we find that these statements were not

very prejudicial, and were certainly cured by the admonition given. Finding no abuse of discretion, we affirm.

■ Appellant next asserts that the trial court should have granted a mistrial where Jean was permitted to testify as to the nature of her relationship with Appellant. Appellant argues that the testimony amounted to impermissible sexual stereotyping based on the homosexual nature of their relationship. We find no merit in this argument. The testimony to which Appellant now objects simply concerned who played a more dominant role in the relationship. While Jean was permitted to testify that Appellant frequently ordered her around, Appellant similarly testified that it was in fact Jean who played the more domineering role in the relationship. No contemporaneous objection was entered at trial, and Appellant now asks for reversal based on palpable error resulting in manifest injustice. RCr 10.26. We find that testimony concerning the dynamic between the two women in no way unduly prejudiced Appellant, and therefore no palpable error occurred.

### IV. Hearsay Evidence

■ Appellant's next claim that hearsay evidence was improperly admitted at trial is not preserved; a palpable error review is requested. RCr 10.26. Appellant objects to certain testimony elicited from Jean Crittendon during re-direct examination. Both Appellant and Jean were charged with arson; the morning after Mr. Russell's death, the stolen car was found burned on the side of the road. As part of her plea agreement, Jean pled guilty to the arson charge, but later testified at Appellant's trial that Christine Martin, Appellant's daughter, set the car on fire. Due to this admission, Appellant received a directed verdict on the arson charge. Appellant now argues that the following testimony—concerning Jean's motivation

in pleading guilty to a crime that she apparently did not commit—is inadmissible hearsay that the Commonwealth used to bolster Jean's credibility. In other words, the testimony was used by the Commonwealth to portray Jean as someone who behaves as she is told, and therefore blindly followed Appellant's orders at Mr. Russell's house. We disagree.

Appellant objects to the following testimony:

Q: Do you remember telling me that your lawyers told you . . .

A: Yes.

Q: To enter that plea?

A: Yes.

Q: Is that what you told me in the back room, a while ago?

A: Yes.

Q: And that's why you pled guilty to the arson . . .

A: Yes.

The responses given by Jean Crittendon are not hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. KRE 801(c). In the above exchange, Jean is not attempting to assert, as true, that her attorneys told her to plead guilty. Rather, she is testifying as to what she told the Commonwealth's Attorney before the trial and the Commonwealth's Attorney stopped short of asking Jean specifically what her attorneys had told her. As Jean is the declarant, these statements are not hearsay. Thus, no error occurred.

The remaining claims of error raised by Appellant of alleged hearsay evidence are rendered moot by virtue of our holding concerning the wanton murder charge.

### V. Testimony of Detective Caudill

■ Appellant next claims that the trial court erred when it prohibited Detective Caudill from answering defense counsel's questions about Tommy Crittendon's prior felony convictions. Tommy Crittendon, Jean's son, was also charged with wanton murder, first-degree burglary, and theft in this matter. He was awaiting trial at the time of Appellant's trial, and was not called as a witness. Defense counsel sought to question Detective Caudill regarding Tommy's prior felony conviction for burglarizing Mr. Russell's home, some two years prior. Appellant claims that the testimony was admissible to show bias on the part of Jean Crittendon. As argued by defense counsel, the evidence of Tommy's prior conviction would be admissible at his own trial, and theoretically would heighten the chances of conviction for his present charges. Therefore, Jean would be more likely to shift blame to Appellant in order to shield her son from a guilty verdict.

■ The trial court entertained lengthy arguments from both parties concerning the admissibility of this evidence, and ultimately determined that evidence of Tommy Crittendon's prior conviction for burglarizing Mr. Russell's home was inadmissible as irrelevant to the issue of Jean's credibility. Appellant now challenges that holding, claiming that her ability to expose Jean's potential bias was improperly infringed upon. We disagree. Of course, a criminal defendant enjoys a constitutionally protected right to cross-examine witnesses in order to expose a potential bias or motivation in testifying. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974). However, the scope and extent of cross-examination is within the sound discretion of the trial judge. *Barrett v. Commonwealth,* 608 S.W.2d 374, 376 (Ky.1980). In delineating the boundaries of the trial court's discretion in limiting cross-examination, this

Court has noted: "So long as a reasonably complete picture of the witness' veracity, bias, and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Commonwealth v. Maddox,* 955 S.W.2d 718, 721 (Ky.1997) *citing United States v. Boylan,* 898 F.2d 230, 254 (1st Cir.1990). Here, the restrictions placed on the cross-examination of Detective Caudill to expose Jean's bias were minimal. Jean's potential bias had already been exposed in several ways: the jury was made aware that her son faced charges stemming from the same incident, and lengthy cross-examination was permitted to establish that Jean sought to protect her son. The trial court ruled that the evidence presented adequately exposed Jean's potential bias or motivation in testifying against Appellant, and that testimony regarding Tommy's prior conviction was not relevant to further establish Jean's bias and would likely confuse the jury. We find that the trial court acted well within its discretion in doing so.

## VI. Failure to Hold a Competency Hearing

■ Appellant next claims that she was denied due process of law when the trial court failed to hold a competency hearing as required by KRS 504.100(3). This issue is unpreserved, but Appellant asks this Court to review the matter for manifest injustice pursuant to RCr 10.26. Prior to trial and pursuant to defense counsel's motion, the trial court ordered a competency evaluation for Appellant pursuant to KRS 504.100. The resulting report revealed that Appellant's intellectual level fell in the borderline range and that she suffered from alcohol dependence, which was in remission due to her pretrial incarceration. The report concluded that Appellant was competent to stand trial. At a pretrial hearing, defense counsel stated to the trial court that she did not expect

to request a competency hearing. On the morning of the third day of trial, the trial court again raised the issue of the competency evaluation, and defense counsel stated that Appellant was waiving any hearing on competency.

Appellant now asserts that the trial court erred in failing to hold a hearing regarding the competency evaluation. According to Appellant, KRS 504.100(3) mandates that the trial court hold a hearing to determine the competency of a defendant whenever a competency evaluation has been filed. Appellant further argues that the defendant cannot waive this hearing, and that the trial court was required to hold the hearing despite defense counsel's waiver.

■■■ The standard of review in this matter is "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Thompson v. Commonwealth,* 56 S.W.3d 406, 408 (Ky.2001) *citing Mills v. Commonwealth,* 996 S.W.2d 473, 486 (Ky. 1999). We conclude that the trial judge in this matter acted reasonably with respect to Appellant's competency. At the time when a determination as to whether to conduct an evidentiary hearing was made, the trial judge was presented with two factors: a competency evaluation concluding that Appellant was competent to stand trial; and defense counsel who on two separate occasions stated that a hearing was unnecessary. It is true, as Appellant asserts, that a hearing to determine competency cannot be waived. *Mills,* 996 S.W.2d at 486. However, upon appellate review, the fact that the defendant is affirmatively waiving an evidentiary hearing may be taken into account in evaluating whether the trial judge acted reasonably in failing to hold such a hearing. It is also important to note that Appellant's first trial in this matter ended in a mistrial, and that the trial judge had observed Appellant testify at that trial. Furthermore, the trial judge had received a three-page letter from Appellant, discussing defense counsel's failure to communicate with her regarding the case. Reviewing all of the information available to the trial court, we conclude that a reasonable trial judge would not have experienced doubt with respect to Appellant's competency.

## VII. Motion to Disqualify Jurors

■■■ In her final argument, Appellant claims that she was denied full use of her peremptory challenges when the trial court denied six motions to excuse jurors for cause. In essence, Appellant is arguing that the jurors' responses during voir dire established that each could not render a fair or impartial verdict, and that each should have been disqualified by the trial court pursuant to RCr 9.36(1). We will discuss each juror briefly below.

Juror TF stated during voir dire that she had a close, friendly relationship with two state troopers who participated in the investigation of Mr. Russell's death. Juror TF stated that these relationships would not impact her judgment on the case, and it was thereafter established that neither of the troopers were going to testify at the trial. For these reasons, the trial court denied a motion to remove Juror TF for cause.

Juror RS revealed that she also had a personal relationship with the two state troopers, as well as Detective Caudill. However, Juror RS unequivocally stated her relationship with Detective Caudill would not cause her to give his testimony any more or less weight than other witnesses' testimony. Juror RS also remembered reading about the case in the local newspaper, and thinking that it was "a

terrible thing to happen." Defense counsel moved to strike Juror RS due to her relationship with the troopers and Detective Caudill, and because her statement revealed that she had already formed an opinion about the case. The trial court denied the motion, relying on Juror RS's assurance that she would judge the case fairly, and the fact that Juror RS had revealed no prejudice towards the defendant.

Appellant believed four jurors should have been excused by the trial court due to their stated beliefs regarding homosexuality. Juror PS made a statement during voir dire that could be interpreted as a negative attitude towards homosexuals: Juror PS stated that he did not "believe" in such relationships. Juror LW responded that she had personal and religious beliefs regarding homosexuality, but did not elaborate. Juror LG replied that she believed homosexual relationships are "wrong." Finally, Juror LH also stated that she "didn't believe in" homosexual relationships. Defense counsel moved to strike all four of these jurors on the basis of their stated attitudes towards homosexuality. The trial court denied all four motions, giving weight to each juror's specific assurance that he or she could set aside those beliefs and consider the case without regard for Appellant's homosexual relationship.

■■■ Whether a juror should be excused for cause is a matter within the sound discretion of the trial court, and will be disturbed only upon a showing of an abuse of discretion. *Maxie v. Commonwealth*, 82 S.W.3d 860, 863 (Ky.2002). With respect to Jurors RS and TF, we find that the trial court did not abuse its discretion in refusing to excuse these jurors due to their relationship with witnesses, or because Juror RS had read about Mr. Russell's death. This Court has held that prospective jurors are not disqualified "merely because they may have heard something about the case or may be acquainted with the parties. Prospective jurors are still qualified to sit on a case provided reasonable grounds exist to believe they can render a fair and impartial verdict based solely on the evidence adduced." *Id.* at 862. The trial court was provided reasonable grounds to believe both jurors could consider the case fairly when each made affirmative statements to that effect. We find no abuse of discretion here.

■■■ With respect to Appellant's arguments concerning Jurors PS, LW, LG, and LH, we conclude that the trial court did not abuse its discretion in denying defense counsel's motions to excuse. While each of these jurors admitted that they personally did not believe in homosexuality, each candidly stated that their personal beliefs would not affect their impartiality. Furthermore, it should be noted that the trial court excused several prospective jurors based on their stated beliefs towards homosexuality. The record reveals that the trial court carefully drew distinctions between the types of attitudes prospective jurors held towards homosexuality: prospective jurors who considered homosexuality as an abomination were excused, while jurors who did not hold a personal belief in homosexual relationships were questioned further. From those jurors expressing that they did not personally believe in homosexuality, only those who specifically indicated they could set aside those beliefs and consider the case impartially were retained, as did PS, LW, LG, and LH. It is within the broad discretion of the trial court to consider and give weight to the responses of each juror, and we find that the trial court based its decisions on the assurances of each juror as to his or her ability to remain impartial. We

see no basis to find that the trial court abused its discretion and, therefore, affirm.

For the foregoing reasons, the judgment of the Breathitt Circuit Court is affirmed in part as to Appellant's conviction for burglary in the second degree and theft by unlawful taking. Further, we vacate Appellant's conviction for wanton murder and remand this case to the Breathitt Circuit Court with instructions to enter a judgment consistent with this Opinion.

LAMBERT, C.J.; COOPER and KELLER, JJ., concur.

GRAVES, J., dissents by separate opinion with SCOTT and WINTERSHEIMER, JJ., joining that dissent.

WINTERSHEIMER, J., dissents by separate opinion, with GRAVES and SCOTT, JJ., joining that dissent.

Dissenting opinion by Justice GRAVES.

Concurring with Justice Wintersheimer's well-reasoned dissent, I write separately to respectfully examine the majority's conclusions regarding the directed verdict for wanton murder, considering the reality that defendants take the victim as they find him. Justice Wintersheimer's dissent establishes a firm foundation for the jury's verdict, and common knowledge regarding heart attacks, supported by medical studies, buttresses that foundation. The evidence presented at trial concerning Appellant's course of conduct the entire time she was with the victim provided the jury with ample opportunity to reach the conclusion overturned by the majority today.

Wanton murder, as defined by KRS 507.020, requires wanton conduct with respect to both the result and the circumstances, manifesting an extreme indifference to human life. *Cook v. Commonwealth*, 129 S.W.3d 351, 362–363 (Ky. 2004). Wanton conduct resulting in homicide, unaccompanied by extreme indifference to human life, supports a conviction of second-degree manslaughter under KRS 507.040, rather than wanton murder—a distinction necessarily left to the trier of fact. *Id.*

Even ignoring Appellant's full course of conduct, and examining only her order to Jean as the majority does, a jury could reasonably convict Appellant for wanton murder. Several factors contribute to the wantonness of Appellant's conduct. The definition of "wantonly" found in KRS 501.020(3), as cited by the majority, and wanton conduct should be considered in the context of the common law of torts and the "thin skull" or "eggshell plaintiff" rule. This longstanding rule of tort law illustrates that although a result may be improbable, a certain element of liability remains. Thomas A. Street explains the principle in his THE FOUNDATIONS OF LEGAL LIABILITY: A PRESENTATION OF THE THEORY AND DEVELOPMENT OF THE COMMON LAW, 457 (1906),

> And if my neighbor, having an unusually thin skull, though his appearance does not so indicate, is thrown upon his head and suffers great damage, can I claim to have my liability limited to the damage which would have been suffered by a man with a normal skull?

We should bear in mind this rule and the relative improbability of a resulting homicide, when exploring the circumstances surrounding wanton conduct. Thus, whenever a criminal defendant engages in conduct affecting a victim's bodily integrity, courts should take into account that such conduct may demonstrate an indifference to human life, even where death is not the most probable result. Al-

though the offender must be "aware of and consciously disregard an unjustifiable risk" under KRS 501.020(3), the "thin skull" rule may be understood in this context to mean that some risks are never justifiable. The "eggshell plaintiff" rule in this context recognizes that the jury may believe a defendant was aware of risk simply because, however improbable, the risk could never be justified. In a case such as this one, for example, although Appellant may not have personally been aware of Mr. Russell's heart problems, it may be unjustifiable for her to claim that she was unaware that an 87–year–old man, when subjected to severe stress and a physical attack, could suffer cardiovascular failure or other severe injury.

The majority correctly explains that on a motion by the defendant for a directed verdict, the trial court must view the evidence in the light most favorable to the Commonwealth, and then determine whether the evidence could convince a juror of the defendant's guilt beyond a reasonable doubt. The majority then relates a course of events from which a juror could reasonably find from the evidence in favor of the Commonwealth. First, Appellant directed Jean Crittendon to remove Mr. Russell's keys from his pocket. When Ms. Crittendon followed Appellant's instructions, the victim turned white and his breathing changed. Once Jean had the keys, Appellant asked her to wait outside in the car, leaving Appellant and the victim alone in the house. Jean explained that she left the house undisturbed, and the victim without any external injuries. From this version of the facts, the majority concedes that it is reasonable to infer that Appellant disrupted the house and caused the victim to have a heart attack. Nonetheless, the majority then holds, without explanation, that, "To find Appellant guilty of wanton murder, the jury was required to conclude that Appellant acted wantonly in ordering Jean to take Mr. Russell's keys." But Appellant's order to take the victim's keys only began her course of conduct.

According to the National Heart, Lung, and Blood Institute, about 1.1 million Americans suffer from heart attacks each year, of which about 460,000 are fatal. (www.nhlbi.nih.gov/actintime/aha/aha.htm). If, as the majority explains, it is fair to infer that Appellant disrupted the house after the victim's heart attack, then what prevents the jury from considering that conduct wanton? The National Heart, Lung, and Blood Institute also explains that treating a victim of a heart attack quickly can save his life and limit damage to the heart. From Appellant's inferred actions after the victim's heart attack, including jerking the phone from the wall and physically injuring Mr. Russell as he lay helpless, the jury could have reasonably found an extreme indifference to human life. Having only considered Appellant's command to Jean, the majority ignores what the jury most likely considered Appellant's assessment of the value of human life, based on her reasonably inferred actions when she was alone with a man who required immediate medical attention.

In this case, Appellant ordered her friend to assault an 87–year–old man. The majority draws attention to Mr. Russell's ability to chop wood days before the murder, but fails to explain why Appellant should have been aware of this fact and believed that Mr. Russell was healthy. Nevertheless, the majority's attempt to convince only leads to the conclusion that a reasonable person would have had doubts about Mr. Russell's health. Mr. Russell may have been a healthy 87–year–old man, but the jury could also have believed that any attack upon an octogenarian would manifest an extreme indifference to human

life. Mr. Russell's heart attack, while improbable, was more likely than it would have been twenty or thirty years ago. Calling to mind the "thin skull" rule, the jury may have believed that ordering someone to attack an 87–year–old man presents an unjustifiable risk of death, even if the risk were improbable.

The existence of the tort rule supports submitting the question to the finder of fact, especially in light of Appellant's actions after the victim's heart attack, which clearly manifested an extreme indifference to human life. The jury found against Appellant and I join Justice Wintersheimer in affirming the jury's conclusion.

SCOTT, and WINTERSHEIMER, J.J., join this dissent.

Dissenting opinion by Justice WINTERSHEIMER.

I must respectfully dissent from that part of the majority opinion that reverses the wanton murder conviction. The trial judge did not err in denying the motion for a directed verdict on wanton murder because there was substantial evidence that the death of the victim occurred while Turner was engaged in conduct which created a grave risk of death under circumstances manifesting an extreme indifference to human life.

The victim was found dead inside his home with a laceration on his scalp and an abrasion on his wrist. The residence was in disarray, apparently from a serious struggle. A crime scene photograph showed that the victim was found on the floor with his pants torn, blood stain on his clothing, a pair of scissors and a knife under his leg.

The cause of death was technically determined to be athrosporadic cardiovascular disease, sometimes known as coronary artery disease. Under all the circumstances surrounding the death, the medical examiner rendered an opinion that it was a homicide. Turner, her girlfriend Crittendon, and Crittendon's son were all charged. The girlfriend pled guilty and testified against Turner. The trial has been called a swearing contest between the co-indictee and Turner—all the more reason to let a jury decide credibility.

The evidence indicates that Turner and two other defendants went to the home of the victim in order to borrow his car. When he refused to let them have it, Turner ordered Crittendon to take the victim's keys. Crittendon did so, and in the process, the victim, an 87 year-old man, died sometime following the struggle. Certainly, the cardiac episode produced a fatal result for the victim, and it could reasonably be inferred that Turner was the cause. The keys were removed from the pocket of the victim apparently with such force that his pants were torn. There was testimony from the son of the victim that his father had been taking high blood pressure pills for three or four years. The medical examiner reported that the victim was 5′5–1/2″ tall, weighed 144 lbs., and had severe coronary disease in two of the three major coronary arteries of his heart. The medical examiner explained that if something happens to excite a person, or causes stress to a person who has coronary artery disease, it could make them have an irregular heartbeat.

When taken in the light most favorable to the prosecution, the evidence, albeit circumstantial, strongly suggests that there was a further assault on the victim while he was having the heart attack, and while it was apparent that he was having such an attack. The victim was not only physically abused, but was left having a heart attack without access to telephone, vehicle or any apparent method to summon help.

In her statement to the police, Turner indicated that she was aware that the telephone had been jerked from the wall. Under all the circumstances, it was extreme indifference to the value of human life in that Turner was present with a man, apparently suffering a heart attack or severe manifestations of heart disease, where his telephone had been disabled and his car keys taken only so that she and others may obtain liquor. The death occurred under circumstances creating a grave risk of death, and the circumstantial evidence shows that the victim incurred additional injury while exclusively with the defendant. A wanton murder instruction was appropriate. *See Adcock v. Commonwealth*, 702 S.W.2d 440 (Ky.1986). The standard for the sufficiency of the evidence to sustain a conviction is set out in *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991), and in the federal case of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

On appellate review of a motion for a directed verdict, we must consider the evidence as a whole and determine if it was clearly unreasonable for the jury to find guilt. If so, then the defendant is entitled to a directed verdict of acquittal. *Benham, supra,* at 187. Here, the evidence was substantive and sufficient to sustain a wanton murder conviction.

In ruling on a motion for a directed verdict, the trial judge must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth, and then determine if such evidence is sufficient to induce a reasonable juror to find guilt beyond a reasonable doubt. *Benham*, 816 S.W.2d at 187. Here, the evidence was sufficient to support a finding of guilt beyond a reasonable doubt.

It cannot be said that any rational trier of fact could not have found the essential elements of the crime beyond any reasonable doubt. It was not error to deny the motion for a directed verdict of acquittal. The evidence here clearly justifies the wanton murder conviction. KRS 501.020(3) states in pertinent part "the risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

A trial judge must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. The trial judge was correct and this Court should not substitute its version of the evidence.

The judgment of conviction should be affirmed as to the wanton murder charge.

GRAVES and SCOTT, JJ., join this dissenting opinion.