RENDERED: OCTOBER 19, 2006
TO BE PUBLISHED

# Supreme Court of Kentucky



NO. 2005-SC-000832-MR

DAMIEN A. SUBLETT                                                          APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
V.              HONORABLE LISABETH HUGHES ABRAMSON, JUDGE
INDICTMENT NOS. 03-CR-002331, 03-CR-003102, AND 05-CR-000556

COMMONWEALTH OF KENTUCKY                                        APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Damien A. Sublett pleaded guilty to twenty-two counts of first-degree robbery, expressly reserving his right to appeal from the trial court's denial of his motions to suppress, and received a twenty-five year prison sentence in a plea agreement with the Commonwealth. He appeals to this court as a matter of right[1] contending that the trial court erred by (1) denying his motion to suppress evidence obtained in two searches conducted at the respective homes of his mother and sister

---

[1]  Ky. Const. § 110 (2) (b).

and (2) denying his motion to suppress statements he made to police interrogators following his arrest. Finding no error, we affirm.

## FACTS

When Sublett was paroled in May 2003, he signed a written agreement containing the conditions of supervision for his release. They included the following:

> V. A. I agree that I may be subject to search and seizure if my officer has reason to believe that I may have illegal drugs, alcohol, volatile substances, or other contraband on my person or property.
>
> . . . .
>
> VI. A. I shall permit my Probation and Parole Officer to visit my residence and place of employment at any time.
>
> . . . .
>
> J. I shall not violate any law or ordinance of this state or any other state or of the United States.

Within weeks after Sublett's release on parole, Louisville Metro Police identified him as the primary suspect in a series of robberies. Detective Larry Duncan knew Sublett from prior arrests, and he was aware of Sublett's parolee status. Duncan believed he recognized Sublett on videotapes of some of the robberies. And he relayed his suspicions to robbery detectives. He also prepared photo arrays to show the victims, obtaining positive identifications of Sublett from some victims. On August 27, 2003, Duncan prepared an affidavit and request for a warrant to search the home of Sublett's mother, Gail, where Sublett was supposed to be living.

That same day, Sublett's parole officer, Officer Johnson, went to Ms. Sublett's home for the stated purpose of a "home visit." Officer Johnson was aware

-2-

at the time that Sublett was the primary robbery suspect. Ms. Sublett allowed Officer Johnson to enter the home and stated that Sublett was not present but had been staying with his sister. She stated that he would be back the next day if Officer Johnson would return then.

On August 28, 2003, Detective Duncan received word in the morning that other Louisville Metro Police officers were en route to Ms. Sublett's home to arrest Sublett before Detective Duncan was able to obtain the search warrant he was seeking. Meanwhile, Officer Johnson returned to Ms. Sublett's home, accompanied by Probation and Parole Officer Hamilton, intending to arrest Sublett for the robberies. Ms. Sublett informed the parole officers that Sublett was still at his sister's house. She phoned Sublett and told him to return to her home because Officer Johnson was conducting a home visit and needed him to take a drug test. According to the trial court's findings, Ms. Sublett consented to the parole officers entering her home. When Sublett arrived, he was arrested by Officer Hamilton.

Immediately following the arrest, Louisville Metro Police officers, who had been waiting outside Ms. Sublett's residence, entered and searched the premises. But they seized no evidence at that time. Following the arrest and search, Ms. Sublett provided police with contact information for Sublett's sister, Detra Payne.

The police immediately contacted Payne, who consented to a search of her home. In searching Payne's home, the police found Sublett's black backpack containing a large amount of money in a mesh laundry bag, a pair of Sublett's jeans with a wad of money in the pocket, and other items of his clothing. Police also found several money wrappers outside Payne's residence. Payne cooperated with the police,

gave a recorded statement indicating that she had voluntarily consented to the search, and expressed surprise concerning some items found. She told officers that her brother would sometimes spend a night or two at her house, leave for awhile, and then return to stay later. He had spent several days with her before his arrest.

Following his arrest, police transported Sublett to their Robbery Unit Office for questioning. While being held at that location, Sublett wrote the word "Refused" and his initials on a form for waiver of Miranda[2] rights, which was also signed by Detective Mark Hickman. Later that same day, Sublett signed a waiver of rights form. Sublett contends that he invoked his rights to remain silent and to speak to an attorney and only signed a waiver form when police demonstrated an unwillingness to honor these rights. At the suppression hearing, police officers testified that Sublett never invoked these rights, that these rights were fully explained, that Sublett never told any officer of a prior refusal to talk with any other officer, and that he seemed knowledgeable of the process.

Sublett admitted to fifteen of twenty robberies in a statement to Detective Duncan, but he also stated that multiple personalities named Rick and Carlos had inhabited his body and had committed the robberies. In a later interview with Detective Wayne Colebank that same day, Sublett stated that Rick and Carlos were present and responding to questions and eventually invoked his right to remain silent and to counsel, at which time the interview ceased. According to Detective Colebank, Sublett invoked his rights when confronted with the fact that the perpetrator had cut one victim with a knife in a struggle during a robbery.

Grand juries indicted Sublett for twenty-two counts of robbery, one count of attempted murder, and one count of fourth-degree assault. Following resolution of

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

-4-

the question of Sublett's competency, he filed motions to suppress evidence obtained in the searches of his mother's and his sister's homes and his statements to police at the Robbery Unit Office. The trial court denied the motions. Sublett filed a pro se motion for reconsideration of the suppression motions, but the reconsideration was not ruled upon by the trial court before Sublett reached a plea agreement with the Commonwealth and entered a conditional guilty plea.[3] This appeal followed.

## ANALYSIS

### I. Sublett's Arrest was Legal.

#### A. Mother Consented to Parole Officers' Entry.

According to Sublett, this case presents a novel question regarding whether parole officers have authority to enter a home without a warrant to arrest a parolee under KRS 439.430 (1). This statute allows a parole officer to arrest a parolee upon a reasonable suspicion of violation of the terms of release. Sublett concedes that "[t]here is no doubt that the statute authorizes an arrest. But it does not specify whether the officer relying on Subsection (1) can enter a house to effect the arrest." Sublett contends that absent exigent circumstances, a warrantless entry into one's home to make an arrest is unconstitutional under Payton v. New York.[4] The Commonwealth correctly responds that this precise issue was not presented to the trial court and, thus, is not preserved for appeal.

---

[3] Kentucky Rules of Criminal Procedure (RCr) 8.09.

[4] 445 U.S. 573 (1980).

Regardless of preservation, we need not reach this issue to resolve this case. Payton expressly forbids "a warrantless and *non-consensual* entry into a suspect's home in order to make a routine felony arrest."[5] But this case does not involve a non-consensual entry because Ms. Sublett consented to it. And as owner and occupant of the home, she had authority to admit the parole officers.[6] So regardless of whether KRS 439.430 (1) grants parole officers the authority to enter a home without a warrant to make an arrest, the authority to enter this home was granted by the consent of Ms. Sublett. Under RCr 9.78, the trial court's factual finding that Ms. Sublett consented to the entry of her home is conclusive since we find it to be supported by substantial evidence. The general prohibition against warrantless entry into the home may be overcome by any valid exception to the warrant requirement, such as consent.[7]

Differing facts of this case dictate a different outcome from our holding in Coleman v. Commonwealth,[8] in which the lack of consent to the entry and the lack of reasonable suspicion of a parole violation compelled a finding that the entry into the home was unlawful; and the evidence uncovered at the home should have been suppressed.

B.    Parole Officers Had Statutory Authority to Arrest Sublett.

Sublett argues that parole officers are not "peace officers," that they have only very limited arrest powers under KRS 439.430, and that his arrest was unlawful because of the parole officers' failure to conform to KRS 439.430. We do not find it

---

[5]    *Id.* at 576 (emphasis added).

[6]    Colbert v. Commonwealth, 43 S.W.3d 777, 781 (Ky. 2001).

[7]    *Id.* at 779.

[8]    100 S.W.3d 745 (Ky. 2002).

necessary to address whether parole officers are "peace officers" in the general sense of the word. KRS 439.430 empowers parole officers to arrest in certain situations. That statute provides, in pertinent part:

(1)     Any parole officer having reason to believe that a parolee has violated the terms of his release may arrest the parolee without a warrant or may deputize any other peace officer to do so by giving him a written statement setting forth that the parolee, in the judgment of the parole officer, has violated the conditions of his release. The written statement delivered with the parolee by the arresting officer to the official in charge of the station house, jail, workhouse, or other place of detention, shall be sufficient warrant for the detention of the parolee. The parole officer who arrests or causes the arrest of the prisoner shall notify the commissioner or his designee at once of the arrest and detention of the parolee, and shall submit in writing a report showing in what manner there has been a violation of the conditions of release. Thereupon, if the commissioner or his designee believes the parolee should be returned to prison, the commissioner or his designee at once shall submit his recommendation to the board, and, if the board approves, it shall issue a warrant upon which the releasee shall be returned to prison; otherwise the prisoner shall be released upon the order of the commissioner or his designee.

(2)     A written statement, approved by the commissioner or his designee, by a parole officer, and filed with the board setting forth that the parolee in the judgment of the officer has violated the condition of his release, shall be sufficient cause for the board, in its discretion, to issue a warrant for the arrest of the parolee, or for his return to prison.

Sublett argues that in order to effectuate a valid arrest, a parole officer must either deliver a written statement to the detention facility and submit a written report to the Commissioner of the Justice Cabinet under Subsection 1, or must submit a written report to the Parole Board seeking a warrant under Subsection 2. He posits

-7-

"[t]here is no evidence that Officer Johnson complied with either option[ ]" since no application was made to the Parole Board for a warrant, and there is no "evidence that Officer Johnson deputized the Louisville Metro Police Officers who accompanied her on August 28th."

We find no requirement for Officer Johnson to deputize the accompanying police officers. Officer Johnson had reason to believe that Sublett had violated his parole by committing robberies and so she was authorized to arrest him herself. Subsection 1 presents two options to parole officers having reasonable suspicion of parole violation: arrest the parolee or deputize a peace officer to do so. Since Officer Johnson arrested Sublett with Officer Hamilton's assistance, there was no need to deputize another to arrest him.

As for the Subsection 1 requirement that a written statement from the parole officer be sent to the detention facility along with the parolee, this requirement only applies to situations in which other officers are deputized to make the arrest. This subsection states that the parole officer may arrest on reasonable suspicion of parole violation or "may deputize any other peace officer to do so by giving him a written statement setting forth that the parolee . . . has violated the conditions of his release." The next sentence then states that "[t]he written statement delivered with the parolee by the arresting officer" to the person in charge of the detention facility "shall be sufficient warrant for the detention of the parolee." Construing the first two sentences of Subsection 1 together, the parolee may be arrested without a warrant by the parole officer or may be arrested by another peace officer with a parole officer's written statement (which serves as a sufficient warrant) setting forth the parole violation. But

-8-

we do not read this subsection as requiring a written statement of parole violation to be delivered to the detention facility with the parolee if the parolee is arrested by a parole officer.

As for the requirement that the parole officer who arrests or authorizes the arrest must submit a written report concerning the parole violation to the commissioner, this requirement obviously relates to parole revocation hearings, as evidenced by the next sentence stating that upon the arrest of the parolee, the commissioner submits a recommendation to the board and the board decides whether the parolee be returned to prison or released. As the Commonwealth points out, Sublett's parole was not revoked; rather, he was charged with the new robbery offenses, constituting a parole violation.

In any case, a failure strictly to comply with these record-keeping requirements will not invalidate an otherwise proper arrest and conviction. Longstanding Kentucky case law holds that record-keeping requirements exist for the benefit of arresting officers rather than parolees.[9]

Furthermore, because the parole officers had authority to and did arrest Sublett themselves under Subsection 1, Subsection 2 is not applicable. Subsection 2 allows a parole officer to file a written statement with the board (after having such statement approved by the Commissioner) so that the board can decide whether to

---

[9] Evans v. Thomas, 372 S.W.2d 798, 800 (Ky. 1963) (upholding trial court's refusal to grant writ of mandamus to compel release from prison where parolee was arrested by police upon telephone notice of parole violation by parole officer and without written statement setting forth violation, as "[t]he written statement required by [KRS 439.430 (1)] is for the protection of the arresting officer. . . . The method used is condemned, but we find no reason that this technical defect should have the effect of vacating the original judgment of conviction." The court noted that the parolee was returned to prison under the parole officer's parole violation warrant two days after his arrest; that he was in prison on the underlying robbery charge; and that he received a parole revocation hearing, but he was held for two days without proper authority.).

issue a warrant for the parolee's arrest or return to prison. As the Commonwealth points out, Sublett was not sent back to prison by the board for parole revocation.

Since we have determined that the arrest itself was legal, there is no need to reach the Commonwealth's alternative arguments concerning inevitable discovery and whether the removal from the home and the giving of <u>Miranda</u> warnings purged any later statements of the taint of an illegal arrest.

## II.    Search of Sublett's Backpack and Jeans was Reasonable.

Sublett argues that the police illegally searched his backpack and jeans, which were found in Payne's home. The trial court found that Payne had voluntarily consented to the search of her home and that her consent "was sufficient to authorize the seizure" of items belonging to Sublett. The trial court stated, however, that "[Payne's] consent would not extend to the search of Defendant's black backpack or the pockets of his jeans." Nonetheless, the trial court found that the search of these items was justified by the specific conditions of Sublett's release on parole, which indicated that Sublett agreed that he may be subject to search or seizure upon his officer's reasonable suspicion that he had contraband on his person or property. Sublett argues that the trial court incorrectly determined that the search was justified by this condition of release on parole, especially in light of Probation and Parole department regulations on searches.

The Commonwealth contends that this issue was not raised to the trial court. On this issue, Sublett generally contended that his sister did not voluntarily consent to the search of her home and argued that the search of her home in general was illegal in his motion to suppress. But the trial court, acting on its own initiative, brought up the issue

of whether Payne's authority to consent to search of items belonging to her brother extended to the specific searches of the jeans pockets and the backpack. The trial court ruled that Payne did not have such authority. And neither party has addressed the propriety of this distinction in arguments presented to this Court. So we will assume for our analysis that the trial court ruled properly on this issue. We will consider whether the conditions of release on parole, as opposed to consent in general, justify the search of the backpack and jeans. Sublett's jeans were found beside a couch in Payne's living room and his backpack in a mesh laundry bag in Payne's kitchen area—both in common areas of the house and not in areas where Sublett might reasonably have had heightened expectations of privacy.

To some extent, the issue of the search of these particular items was raised in the trial court in Sublett's *pro se* motion for reconsideration, in which he generally argued that the search of his sister's home was not justified by his conditions of parole. He argued that the parole conditions were limited to the actions of his parole officers, and they would not justify a search by police. Sublett did not specifically contest the search of his jeans pockets and backpack as opposed to other items found in his sister's home, however, and the trial court did not rule upon his motion before he entered his guilty plea.

We find that the trial court properly concluded that the search was justified by the plain language of the conditions of Sublett's release on parole. The applicable language states, "I agree that I may be subject to search and seizure if my officer has reason to believe that I may have . . . contraband on my person or property." Sublett argues that this condition only pertains to a search by a parole officer. We disagree.

This condition does not state who must perform the search and seizure but only states that the parolee agrees to a search and seizure if the underlying condition is met. The underlying condition here was the parole officer's reasonable belief that contraband was contained in the parolee's property. While Officer Johnson apparently did not conduct this search herself, she had reason to believe that contraband might be found among Sublett's property at the time Payne's house was searched following Sublett's arrest on multiple robberies. She implicitly authorized the search because she helped deliver Payne to her house to facilitate the search. In the words of the trial court,

> Whether searched by Officer Johnson or an LMPD officer, whether searched on the Payne premises or at the police station, the backpack and jeans were subject to warrantless search and seizure pursuant to Defendant's conditions of parole supervision, given the facts known to all of these officers prior to and following Defendant's arrest.

In effect, Sublett consented to the search by agreeing as a condition of release on parole that he was subject to search upon a parole officer's reasonable suspicion of parole violation. Thus, we need not resolve whether departmental policy would have called for a warrant in the absence of consent. Furthermore, such a policy would not create a right for Sublett but, rather, provides direction for parole officers.

We conclude that the trial court did not err in denying the motion to suppress evidence found in the search of Payne's house, particularly the backpack and jeans pocket, which both contained large amounts of currency.

## III.    Statements Made at the Robbery Unit Were Voluntary.

Sublett argues that the trial court erred in finding that the statements he made to police at the Robbery Unit Office in the hours following his arrest were voluntarily made. He contends that the waiver form which contains the word "Refused" and his initials and

Detective Hickman's signature established that he invoked his right to remain silent and his right to counsel. He admits to signing another waiver form but states that he did so only after deciding that police would not honor the Miranda rights he claims to have invoked. He faults the trial court for accepting Detective Hickman's testimony that the word "Refused" should be interpreted to mean only that Sublett refused to sign a written waiver. Sublett contends that "when a reasonable person sees the word 'Refused' in place of a signature, the only conclusion to be drawn is that the suspect refused to waive his rights." Sublett argues that this was a clear invocation of Miranda rights, making inadmissible any incriminating statements that followed.

The trial court accepted the testimony of several police officers that Sublett did not invoke his rights before making statements. The trial court rejected Sublett's testimony to the contrary. The trial court explained in detail the reasoning that led her to find the officer's version of events more credible, as follows:

> Accepting Defendant's version of the four and one-half hours that transpired between his 9:30 arrest at his mother's home and his signature on the Waiver of Rights form would require the conclusion that every single police officer who came in contact with Defendant prior to 2:00 p.m. on August 28 . . . ignored Defendant's repeated requests to remain silent and to have an attorney. In addition, if Defendant's version were accurate, all of the aforementioned officers who testified lied to the Court while under oath. Moreover, Defendant has admitted to this Court that he lied to Detective Duncan about the presence of his multiple personalities or alter-egos, Rick and Carlos, allegedly because he was being forced to talk and was "acting silly." Accepting Defendant's version of the events also entails concluding that several officers repeatedly denied Defendant's requests for an attorney and invocation of his right to remain silent but then, inexplicably, Detective Colebank honored that right and ceased all questioning about two robberies for which no confession had been made. Although Defendant appears to have been at the Robbery Unit Office for approximately three to four hours before the Rights Waiver form was signed, Defendant's description of events during those hours simply is not credible. Indeed, given the totality of the circumstances, the Commonwealth has met its burden of establishing by a preponderance of the

-13-

evidence that Defendant provided a voluntary statement. *See* <u>Mills v. Commonwealth</u>, 996 S.W.2d 473 (Ky. 1999). (footnote omitted).

We find that the trial court properly exercised its discretion to judge the credibility of witnesses and to draw inferences from their testimony under <u>Commonwealth v. Whitmore</u>.[10] Clearly, the trial court's findings of fact are supported by substantial evidence and, thus, conclusive under RCr 9.78. We find no error in the determination that Sublett validly waived his <u>Miranda</u> rights and that his statements made at the Robbery Unit Office were voluntarily made.

## CONCLUSION

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

All concur.

---

[10] 92 S.W.3d 76, 79 (Ky. 2002).

-14-

COUNSEL FOR APPELLANT:

J. David Niehaus
Deputy Appellate Defender
Office of the Jefferson District Public Defender
200 Advocacy Plaza
719 W. Jefferson Street
Louisville, Kentucky 40202


COUNSEL FOR APPELLEE:

Gregory D. Stumbo
Attorney General of Kentucky

Susan Roncarti Lenz
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, Kentucky 40601